# No. 21-833

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

GERALD ROBERTS, STEPHEN JOHNSON, CHRISTOPHER MCLEOD, DAVID SHAW, ANITA JOHNSON, CHRISTOPHER HUMPHRIES, JEFFREY WILKINS, LATANYA MARTIN-RICE, LAURA SANCHEZ, LUCY MUNOZ, NATALIO HERRERA, RADIKA KANHAI, ROGER SIERRA, YOO SUNG KIM, CHRISTINA LAMBRU, IRENE TSOROROS, MARIA DIAZ, CYNTHIA DURAN, JASPER JONES, ALLEN CHERFILS, LISA LUNDSREN, TERESA AREVALO, SYED A. HAQUE, AHMED TALHA, OLIE AHMED, JAMAL AHMED, SORWAR HUSSAIN, LUZ OSPINA, JOHNNY MURILLO, THOMAS DORGAN, SENECA SCOTT, ERIC LEE, WILLIAM BOONE, MARLENNI MINAYA, ISABEL PENA, CELESTE BROWN-POLITE, DWIGHT CURRY, RAWLO BENFIELD, JOSEPH BROWN, SANDRA MILENAMARTINEZ, MARINO CANO, ABIGAIL APPIAHOTCHERE, DALIA TOPPIN, ANA MOREIRA, BETSABE TORRES, LORNA BENT, OSMOND WALKER, CONRAD HALL, VISHWANI SUKHRAM, ANNE GRONATA, BRUCE SMITH, NESTOR AMAYA, GUIDO ANTONIO RODRIGUEZ, WILLIE BALLENTINE, PETER VONTAS, FELIX GONZALEZ, MICHELLE LATIMER, VARISE WALLER, SOOKIA FREEMAN, CAMARCA FLOWERS, ANTONIO SALCEDO, JOEVEN CORTEZ, and JUDITH ALLEN *on behalf of themselves and all others similarly situated*,
*Plaintiffs-Appellants*,

-against-

GENTING NEW YORK LLC, D/B/A RESORTS WORLD CASINO NEW YORK CITY,
*Defendants-Appellees*,

*On Appeal from a Judgment of the*
*United States District Court for the Eastern District of New York*

## PLAINTIFFS-APPELLANTS' BRIEF

Jesse C. Rose, of Counsel to
Phillips & Associates, PLLC
45 Broadway, Suite 430
New York, New York 10006
212-248-7431

# Table of Contents

**Table of Contents**.................................................................................. i

**Table of Authorities**............................................................................ iii

**PRELIMINARY STATEMENT** .........................................................1

**JURISDICTIONAL STATEMENT**.....................................................2

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW** .......3

**STATEMENT OF THE CASE**.............................................................5

I.   **Relevant Procedural History and Disposition** ...........................5

II.  **Statement of Relevant Facts** .....................................................6

    A. The Aqueduct Buffet ............................................................6

    B. Employees within the Aqueduct Buffet ...............................8

    C. Centralized Services ............................................................12

    D. The Decision to Close the Aqueduct Buffet........................12

    E. The Employees Terminated as a Result of the Closure of the Aqueduct Buffet ...................................................................13

**STANDARD OF REVIEW**..................................................................13

**LEGAL ARGUMENT** .........................................................................15

I.   **A REASONABLE JURY COULD ONLY DETERMINE THAT THE AQUEDUCT BUFFET WAS AN OPERATING UNIT OR SINGLE SITE OF EMPLOYMENT** .......................................15

    A. Purpose of the WARN Act & NY WARN Act ....................16

    B. The Aqueduct Buffet was an operating unit........................18

    C. The Aqueduct Buffet constituted a single site of employment ...........24

II.    **THE EXPERT REPORT OF BJORN MALMLUND
SHOULD BE HELD TO BE INADMISSIBLE
UNDER FRE 702** ........................................................................25

**CONCLUSION** ................................................................................28

# Table of Authorities

**Cases**

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) .....................................14

Aulicino v. New York City Department of Homeless Services,
  580 F.3d 73 (2d Cir. 2009).....................................................................................14

Conn v. Dewey & Leboeuf LLP,
  507 B.R. 522 (Bankr. S.D.N.Y. 2014) ..................................................................16

Dillon v. Morano,
  497 F.3d 247 (2d Cir. 2007)...................................................................................14

FAA v. Landy,
  705 F.2d 624 (2d Cir.),
  *cert. denied*, 464 U.S. 895 (1983) ........................................................................26

Gill v. Acacia Network,
  2015 U.S. Dist. LEXIS 34009 (S.D.N.Y. Mar. 18, 2015) ....................................16

In re Dana Corp.,
  574 F.3d 129 (2d Cir. 2009)...................................................................................14

Kaytor v. Electric Boat Corp.,
  609 F.3d 537 (2d Cir. 2010)...................................................................................14

La Chemise Lacoste v. Alligator Company, Inc.,
  59 F.R.D. 332 (D. Del. 1973) ................................................................................26

Local Union 7107 v. Clinchfield Coal Co.,
  124 F.3d 639 (4th Cir. 1997)..................................................................................17

Marx & Co. v. Diners' Club, Inc.,
  550 F.2d 505 (2d Cir. 1977)
  *cert. denied*, 434 U.S. 861 (1977) ........................................................................26

S. Katzman Produce v. Yadid,
  No. 19-3540-cv,
  2021 U.S. App. LEXIS 17107 (2d Cir. June 9, 2021)...........................................13

Torres v. Gristede's Operating Corp.,
    628 F. Supp. 2d 447 (S.D.N.Y. Aug. 28, 2008) ....................................................14

United States v. Bilzerian,
    926 F.2d 1285 (2d Cir. 1991).................................................................................26

United States v. Scop,
    846 F.2d 135 (2d Cir. 1988)
    *modified*, 856 F.2d 5 (2d Cir. 1988).....................................................................26

**Statutes**

28 U.S.C. § 1291 .......................................................................................................2

28 U.S.C. § 1331 .......................................................................................................2

28 U.S.C. § 1367 .......................................................................................................2

29 U.S.C. § 2101(a)(1)(A) ......................................................................................15

29 U.S.C. § 2101(a)(2)..................................................................................... 15, 24

29 U.S.C. § 2102(a)(1)............................................................................................15

29 U.S.C. § 2101(2)................................................................................................24

29 U.S.C. § 2104(5)...............................................................................................2, 5

Fed. R. Civ. P. 56(c) ...............................................................................................14

Fed. R. Evid. 702 ................................................................................................2, 26

New York Labor Law § 860 et. seq. .....................................................................2, 5

NYLL § 860-a(3) .....................................................................................................16

NYLL §860-a(6) ......................................................................................................24

**Other Authorities**

2008 Annual Report of the New York State Assembly Standing Committee on Labor, p. 15 Dec. 15, 2008 (available at https://nysl.ptfs.com/data/Library1/104996.PDF)................................17

Fed. R. Evid. 704, 1972 Advisory Committee Notes ..............................................26

Note, Expert Legal Testimony, 97 Harv. L. Rev. 797 (1984) ..................................26

**Regulations**

20 C.F.R. § 639.3(j)...................................................................................... 18, 20

20 C.F.R. §639.3(i)(2) ..........................................................................................24

20 C.F.R. §639.3(i)(8) ..........................................................................................24

20 CFR § 639.1(a)..................................................................................................16

54 Fed. Reg. 16042 ................................................................................................17

54 Fed. Reg. 16042(i) ............................................................................................25

54 Fed. Reg. 16042(j) ............................................................................................19

54 Fed. Reg. 16042(j) ............................................................................... 19, 20, 21, 23

N.Y. Comp. Codes R. & Regs. tit. 12, § 921-1.1(k) ..............................................19

N.Y. Comp. Codes R. & Regs. tit. 12, § 921-1.1(p)(1)(vi)......................................24

# PRELIMINARY STATEMENT

Plaintiffs-Appellants Gerald Roberts, Stephen Johnson, Christopher Mcleod, David Shaw, Anita Johnson, Christopher Humphries, Jeffrey Wilkins, Latanya Martin-Rice, Laura Sanchez, Lucy Munoz, Natalio Herrera, Radika Kanhai, Roger Sierra, Yoo Sung Kim, Christina Lambru, Irene Tsororos, Maria Diaz, Cynthia Duran, Jasper Jones, Allen Cherfils, Lisa Lundsren, Teresa Arevalo, Syed A. Haque, Ahmed Talha, Olie Ahmed, Jamal Ahmed, Sorwar Hussain, Luz Ospina, Johnny Murillo, Thomas Dorgan, Seneca Scott, Eric Lee, William Boone, Marlenni Minaya, Isabel Pena, Celeste Brown-Polite, Dwight Curry, Rawlo Benfield, Joseph Brown, Sandra Milenamartinez, Marino Cano, Abigail Appiahotchere, Dalia Toppin, Ana Moreira, Betsabe Torres, Lorna Bent, Osmond Walker, Conrad Hall, Vishwani Sukhram, Anne Gronata, Bruce Smith, Nestor Amaya, Guido Antonio Rodriguez, Willie Ballentine, Peter Vontas, Felix Gonzalez, Michelle Latimer, Varise Waller, Sookia Freeman, Camarca Flowers, Antonio Salcedo, Joeven Cortez, and Judith Allen on behalf of themselves and all other similarly situated ("Plaintiffs") appeal from a final judgment entered pursuant to a decision by the United Stated District Court for the Eastern District of New York by the Honorable District Judge I. Leo Glasser dismissing all of Plaintiffs' claims against Defendant Genting New York

LLC d/b/a Resorts World Casino New York City ("Defendant" or "Genting") under Federal Rule of Civil Procedure Rule 56. Judgment, A1382; SA1.[12]

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to the WARN Act, 29 U.S.C. § 2104(5) (the "WARN Act") which presents a federal question conferring jurisdiction under 28 U.S.C. § 1331. The District Court had supplemental jurisdiction over claims under the New York Labor Law § 860 *et. seq.* (the "NY WARN Act") pursuant to 28 U.S.C. § 1367.

The Second Circuit has jurisdiction over the district court's final order dismissing the complaint under 28 U.S.C. § 1291. Final Judgment was entered in the District Court on March 15, 2021. Judgment, A1403. Plaintiff filed a timely notice of appeal on March 29, 2021. Notice of Appeal, A1405.

This appeal is from all portions of the Judgment that disposed of Plaintiffs' claims, those portions of the Judgment that failed to grant Plaintiffs' motion for summary judgment, and the determination that Defendant's expert report is admissible pursuant to Federal Rule of Evidence, Rule 702.

---

[1] The Appendix will be cited as "A__."
[2] The Special Appendix will be cited as "SA__."

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

Q.     Where a business has multiple restaurants which provide different experiences, have different workers, have different menus, have their own dining areas, have their own kitchens, and have their own management, are those restaurants considered operating units and single sites of employment under the WARN Act and NY WARN Act?

A.     Yes, the WARN Act and NY WARN Act would define these restaurants as being operating units and single sites of employment.


Q.     Did the District Court improperly determine a question of fact in holding that the Aqueduct Buffet was neither an operating unit nor single site of employment under the WARN Act or NY WARN Act?

A.     Yes, the District Court failed to consider the facts in the light most favorable to the Plaintiffs in granting Defendant's motion for summary judgment.


Q.     Did the District Court err in failing to determine that the Aqueduct Buffet was an operating unit or single site of employment under the WARN Act and NY WARN Act?

A. Yes, the District Court did not appropriately apply the definitions of operating unit and single site of employment to the Aqueduct Buffet in denying Plaintiffs' motion for summary judgment.

Q. Did the District Court improperly determine that the expert report of Bjorn Malmlund was admissible under FRE 702?

A. Yes, the District Court permitted the expert report to be considered admissible and persuasive despite it not meeting the requirements of the Federal Rules of Evidence, Rule 702.

## STATEMENT OF THE CASE

Plaintiffs brought this action pursuant to the WARN Act, 29 U.S.C. § 2104(5) and the New York Labor Law § 860 et. seq. after Defendant abruptly closed the Aqueduct Buffet and terminated one hundred and seventy nine (179) employees with zero (0) days' notice.

## I.    Relevant Procedural History and Disposition

Plaintiffs originally filed their Complaint on January 14, 2014. Dkt. No. 1, A7. Plaintiffs filed an Amended Complaint on March 17, 2014. Dkt. No. 5, A8. Defendant filed their Answer to the Amended Complaint on August 29, 2014. Dkt. No. 13, A9.

Discovery concluded on or about July 6, 2015. A13. Both Plaintiffs and Defendant filed Motions for Summary Judgment which were fully briefed and filed before the District Court on February 16, 2016. Dkt. Nos. 53-71, A16-17. The District Court issued its Order, denying Plaintiffs' Motion for Summary Judgment and granting the Defendant's Motion for Summary Judgment on March 12, 2021. Dkt. No. 76, A18; A1382; SA1. Plaintiffs filed a timely Notice of Appeal on March 26, 2021. A1405.

## II.   Statement of Relevant Facts

Defendant Genting New York LLC operates a casino in Queens, New York since 2011 (the "Casino"). Ryan Eller[3] Affidavit, ¶2, A475. The Casino has approximately 5,200 games including electronic slot machines, electronic table games, private events, outdoor space looking over a racetrack, and approximately thirty (30) dining options. Id. ¶¶2-3, A475. These options were organized within a single "Food and Beverage" department. Id. ¶3, A475-6. Among those were "RW Prime (an upscale steakhouse); Genting Palace (a Chinese food restaurant); a Food Court, offering more than seven fast food options; Bar 360 (a bar which also served casual food); a Banquet operation where special events were held; … the New York Racing Association Buffet" and, up until the day that all Plaintiffs were terminated, a restaurant called the "Aqueduct Buffet." Id.

### A. The Aqueduct Buffet

The Aqueduct Buffet was located on the "Second floor adjacent to the entrance of the Times Square Casino across from the food court." Robert Netter[4] Deposition, p. 11:12-16, A72. It was a "three hundred and fifty seat buffet restaurant" with its own kitchen and storage areas.  Id. p. 12:7-16, A73. The Aqueduct Buffet

---

[3] Ryan Eller was the CFO and President of Defendant at various times according to his affidavit. A475.
[4] Robert Netter was the Vice President of Food and Beverage for Resorts World Casino. A68.

was separated from the rest of the casino, did not share any space with any other restaurants, and had only one entrance for guests. Id. p. 12:18-13:2, A73-4. This was the type of venue where you paid one price at the door for entry, then upon entering customers could eat as much as they liked, and then would exit. Id. p. 13:3-11, A74. Customers could not bring in any outside food to the dining room and entrance was regulated by cashiers who took payment prior to entry. Id. p. 14:4-8, A75. Once payment for entry was accepted, the customers would be seated by a host. Id. p. 15:20-22, A76. Within the restaurant, there was one large island in the back where food was served and another in the front where salads and desserts were served. Id. p. 29:10-30:17, A78-9.

The hot items served at the buffet were generally prepared within the buffet's own dedicated kitchen while the cold items were generally prepared in a cold kitchen called the *garde manje*, including sushi and salads. Id. p. 53:22-54:21, 55:20-25; A81-3. Baked goods were supplied by an "outside purveyor" except for the cookies and a few desserts which were made in the buffet's kitchen. Id. p. 54:22-55:7; A82-3. The Aqueduct Buffet was a different product than that sold by other restaurants and vendors within the Casino. Id. p. 141:22-144:21; A108-111.

The customer experience and what customers purchased at the Aqueduct Buffet was completely different than the steakhouse or Genting Palace. Netter Depo.

p. 144:6-21, A111. The Aqueduct Buffet was advertised as a separate product in the Casino's advertising. Advertisements, A134-9.

The Casino, in order to track costs, maintained a separate "cost center" which tracked the costs of operating the various operations. When an employee assigned to the Aqueduct Buffet clocked in for work, the cost of that labor was attributed to the Aqueduct Buffet cost center. Eller Depo. p. 71:11-25, A419; p. 84:11-85:2, A422-3. This was not true for those employees who were part of the Stewarding department, who were organized centrally but assigned to work throughout the entire Casino. Id. p. 81:20-82:3, A422. The managing chef over the Aqueduct Buffet's kitchen and the manager over the dining room, aka front of house, had his salary tracked as a cost of the restaurant. Id. p. 85:17-86:3, A423. All employees terminated whose departments were "Buffet" or "Buffet – Culinary" were included within the Aqueduct Buffet cost center. Id. p. 123:7-16, A432. When determining how many employees to lay off in those cost centers which supported the Aqueduct Buffet, like the *garde manje*, the Casino looked at the decrease in demand due to the closure and reduced the number of employees accordingly. See Id. p. 90:14-91:8, A424. When they closed the Aqueduct Buffet, its cost center was also closed. Id. p. 104:20-22, A427.

B. Employees within the Aqueduct Buffet

The Plaintiffs and those individuals they seek to represent fall into nineteen (19) categories according to the Defendant's records. List of employees laid off,

A850. All of them were terminated due to the closing of the Aqueduct Buffet. Requests for Admission No. 1, A60-1. The titles of those terminated are as follows, with the number of individuals terminated and their assigned "Home Department":

- Buffet Bus Person (3)           Buffet
- Buffet Cook (1)                 Buffet
- Bus Person (6)                  Buffet
- Cashier (5)                     Buffet
- Food Server (32)                Buffet
- Restaurant Host (7)             Buffet
- Buffet Cook (27)                Buffet - Culinary
- Exhibition Cook (15)            Buffet - Culinary
- Food Runner (2)                 Buffet - Culinary
- Kitchen Utility Worker (1)      Buffet - Culinary
- Line Cook (9)                   Buffet - Culinary
- Asian Culinary Cook (1)         Cold Kitchen/Garde Mange
- Exhibition Cook (2)             Cold Kitchen/Garde Mange
- Kitchen Utility Worker (1)      Cold Kitchen/Garde Mange
- Line Cook (10)                  Cold Kitchen/Garde Mange
- Prep Cook (6)                   Cold Kitchen/Garde Mange
- Steward – Heavy Utility (1)     Stewarding
- Steward – Kitchen Worker (49)   Stewarding
- Warehouse Attendant (1)         Warehouse

A850-2. For those employees who worked almost exclusively within the Aqueduct Buffet, employees would bid for a shift every six (6) months and otherwise work a set shift each week. Netter Deposition p. 72:2-18; A86. For the employees assigned to work within the Aqueduct Buffet regularly, they would only work in another venue if there was a special circumstance. Id. p. 121:6-20; A97.

The cashiers and servers wore unique uniform shirts to the Aqueduct Buffet and Equestrius buffet. Id. p. 131:13-19; A102-3. The cooks in the Aqueduct Buffet wore uniforms common to all cooks in the Casino. Id. They only prepared food for consumption at the buffet except for a couple items which they *may* have prepared for one of the other restaurants. Id. p. 134:17-25; A105. Those employees who were terminated from the "Buffet" department were terminated without regard to their seniority in comparison with those from other outlets. Impartial Chairperson Dec. dated Nov. 24, 2015 p. 9 of 18, A391. In other words, they were terminated as the staff of the Aqueduct Buffet, not as an overall reduction in staff across the entire Casino.

Within the Aqueduct Buffet, there was a manager who oversaw the dining room side, titled the Buffet Manager, and another who oversaw the kitchen side, titled the Executive Sous Chef – Buffet. Food and Beverage – Buffet hierarchy, A132; Food and Beverage – Executive Chef hierarchy, A133. These management structures fit within the overall management of the Casino, but were independent from management structures for other restaurants and vendors. Id.

The stewards, who did the cleaning, were assigned based on need by a stewarding manager. Netter Deposition p. 95:12-96:18, A94-5; Food and Beverage – Executive Chef hierarchy, A133. Each of the Stewards terminated as a result of the

closure were terminated due to the reduced demand for cleaning services and were chosen based on seniority. Netter Depo. p. 111:11-18, A274.

The *garde manje* was a cold kitchen where items like "vegetables, salads, cold cuts, sushi and pizza dough" were prepared for the various restaurants, including the Aqueduct Buffet, and the food court. Eller Affidavit ¶16, A480. Each of the individuals terminated within the *garde manje* as a result of the closure were terminated due to the reduced demand for *garde manje* products once the Aqueduct Buffet was closed and were chosen based on seniority. Netter Depo. p. 110:4-15, A274.

A central warehouse stored goods for the entire Casino, including the Aqueduct Buffet. Eller Affidavit ¶18, A481. Employees within the warehouse would deliver items as needed to the restaurants, including the Aqueduct buffet, when requested. Id. One warehouse worker was terminated due to the reduced demand for work in the warehouse as a result of the closure of the Aqueduct Buffet. Netter Depo. p. 111:19-112:20, A274; A852.

In determining who to terminate, in addition to those individuals in the *garde manje*, warehouse, and stewarding, the Casino "laid off all F&B employees who worked in the Buffet, including Servers, Buffet Buspersons, and Hosts/Hostesses. It implemented these layoffs without taking into consideration that some of the employees in these job classifications had more seniority than other Casino

employees employed in the same classifications and working in other food and beverage outlets within the Casino, i.e. RW Prime and Genting Palace." Impartial Chairperson Dec. dated Nov. 24, 2015 p. 9 of 18, A391.

C. Centralized Services

Plaintiffs concede that centralized services were provided to the Aqueduct Buffet. These include the purchasing department, warehouse, stewards, marketing, human resources, hiring, legal, payroll, and accounts payable. Eller Affidavit ¶¶15-21, A480-483. However, this does not take away from the fact that the Aqueduct was a standalone restaurant that produced the vast majority of its own food, restricted entry, received payment from customers, and had dedicated management. *Supra*.

D. The Decision to Close the Aqueduct Buffet

No notice which meets the requirements of the WARN Act or the NY WARN Act was produced in discovery or submitted to the District Court. All of the employees terminated were notified on January 6, 2014, the same day they were fired. Eller Depo. p. 190:13-19, A129; Notice of Closure dated January 6, 2014, A58. The reason that the Defendant decided not to notify these one hundred and seventy nine (179) individuals that they were being terminated before that day was due to what Defendant's President called "an unreasonable risk to allow them to have access to the facility … when they received notice of involuntary layoff." Eller Depo. p. 190:20-191:21, A129-130. In other words, the Casino decided that if they fired

these individuals they could not trust them going forward, so they could not provide a notice.

E. The Employees Terminated as a Result of the Closure of the Aqueduct Buffet

All Plaintiffs were terminated due to the closing of the Aqueduct Buffet. Requests to Admit No. 1, A60-1. Defendant terminated the employees within the *garde manje*, the Steward department, and the warehouse worker due to the closing of the Aqueduct Buffet. Netter Deposition p. 110:4-112:20, A274.[5]

## STANDARD OF REVIEW

The Circuit Court "review[s] the district court's grant of summary judgment *de novo*, applying the same standards that govern the district court's consideration of the motion." S. Katzman Produce v. Yadid, No. 19-3540-cv, 2021 U.S. App. LEXIS 17107, at *25 (2d Cir. June 9, 2021) (quoting Kaytor v. Electric Boat Corp., 609 F.3d

---

[5] ("Q. So the stewards were terminated, although it was determined by seniority, the reason there had to be layoffs was because of the closing of the buffet, right? … A. The stewards were released were released by seniority because the buffet closed, yes. Q. And what about warehouse workers, were there warehouse workers laid off because the buffet closed? A. Again, due to the volumes that were associated with the buffet, if there was less volume coming into the warehouse, then it would make sense that you would have to reduce the staff because the buffets closed." p. 112:16-20, A274. ("Q. So you know that two people were let go from the warehouse – A. Yes. Q. – because the buffet closed? A. Yes."); p. 110:4-15, A274. ("Q. Do you know if individuals employed within the garde manger were terminated as part of the closing of the buffet? A. I believe there were some associated there since some of the products being produced out of the garde manger was going to the buffet. Q. So there was a reduction of work because they didn't need to produce as much food and some people were terminated, right? … A. Correct. By seniority.").

537, 546 (2d Cir. 2010); citing <u>Aulicino v. New York City Department of Homeless</u> <u>Services</u>, 580 F.3d 73, 79 (2d Cir. 2009); <u>Dillon v. Morano</u>, 497 F.3d 247, 251 (2d Cir. 2007)).

"Summary judgment is only warranted upon a showing 'that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" <u>Zakrzewska v. New Sch.</u>, 574 F.3d 24, 27 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but <u>only</u> to determine whether, as to any material issue, a genuine factual dispute exists." <u>In re</u> <u>Dana Corp.</u>, 574 F.3d 129, 151 (2d Cir. 2009) (emphasis added). "[W]hen the party against whom summary judgment is sought comes forth with affidavits or other material obtained through discovery that generates uncertainty as to the true state of <u>any</u> material fact, the procedural weapon of summary judgment is inappropriate." <u>Id.</u> (emphasis added) (citation omitted). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." <u>Torres v. Gristede's</u> <u>Operating Corp.</u>, 628 F. Supp. 2d 447, 454 (S.D.N.Y. Aug. 28, 2008) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The moving party bears the burden of showing that a reasonable jury could not find for the nonmoving party. <u>Id.</u> In this case, no jury could return a

verdict in Defendant's favor based on the plain language of the statutes, regulations and the facts relating to how and why Plaintiffs were terminated.

**LEGAL ARGUMENT**

## I. A REASONABLE JURY COULD ONLY DETERMINE THAT THE AQUEDUCT BUFFET WAS AN OPERATING UNIT OR SINGLE SITE OF EMPLOYMENT

The District Judge incorrectly concluded that the WARN Act and NY WARN Act did not apply to the closure of the Aqueduct Buffet based on a narrow interpretation of the terms "Operating Unit" and "Single Site of Employment," as used in both acts. If the Aqueduct Buffet was an Operating Unit or Single Site of Employment then notice was required and Defendant violated the law.

Under the WARN Act, an employer with one hundred (100) full time employees must provide a sixty (60) day notice if there is a "plant closing", defined as "the permanent or temporary shutdown of a single site of employment, or one or more facilities *or operating units* within a single site of employment if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." SA2-3 (quoting 29 U.S.C. § 2101(a)(2) (emphasis in original); citing 29 U.S.C. §§ 2101(a)(1)(A), 2102(a)(1)). The New York WARN Act "largely mirrors the federal WARN Act, but says that 'employer' includes all employers that employ more than 50 full-time employees, as opposed to 100." Gill v. Acacia Network, 2015 U.S. Dist.

LEXIS 34009, *7 (S.D.N.Y. Mar. 18, 2015) (citing NYLL § 860-a(3)). The New

York law also requires ninety (90) rather than sixty (60) days notice. Id. at *7-8.

The history of the acts, the language used within the implementing

regulations, and the facts of this case require a finding in Plaintiffs' favor.

A. Purpose of the WARN Act & NY WARN Act

> "The Worker Adjustment and Retraining Notification Act (WARN or
> the Act) provides protection to workers, their families and communities
> by requiring employers to provide notification 60 calendar days in
> advance of plant closings and mass layoffs. Advance notice provides
> workers and their families some transition time to adjust to the
> prospective loss of employment, to seek and obtain alternative jobs and,
> if necessary, to enter skill training or retraining that will allow these
> workers to successfully compete in the job market. WARN also
> provides for notice to State dislocated worker units so that dislocated
> worker assistance can be promptly provided."

20 CFR § 639.1(a). "It is civically desirable and it would appear to be good business

practice for an employer to provide advance notice to its workers or unions, local

government and the State when terminating a significant number of employees." §

639.1(e). "By providing for notice to the State dislocated worker unit, WARN notice

begins the process of assisting workers who will be dislocated." § 639.1(f).

"Collective bargaining agreements may be used to clarify or amplify the terms and

conditions of WARN, but may not reduce WARN rights." § 639.1(g). The WARN

Act is a remedial law, application of its terms should be broadly interpreted rather

than allow exceptions or technicalities to justify not providing notice. Conn v.

Dewey & Leboeuf LLP, 507 B.R. 522, 530 (Bankr. S.D.N.Y. 2014) (citing Local

Union 7107 v. Clinchfield Coal Co., 124 F.3d 639, 640 (4th Cir. 1997)). The Department of Labor advises in connection with questions of application that "[i]f the employer 'gambles' … and 'loses', the employer's cost will be 60 days' pay and benefits to at least 50 workers. If the employer gives notice, the cost will be the cost of preparing and mailing [a number of] notices." 54 Fed. Reg. 16042 p. 4 of 47, SA25.

Similarly, the NY WARN Act was enacted "in order to provide employees with greater notification of layoffs." 2008 Annual Report of the New York State Assembly Standing Committee on Labor, p. 15 Dec. 15, 2008 (available at https://nysl.ptfs.com/data/Library1/104996.PDF). "This law and its wage protections [were meant to] give workers more time to prepare for pending unemployment." Id. at 15-16.

Because of the Defendant's refusal to comply with either the WARN Act or the NY WARN Act, one hundred and seventy nine (179) people were terminated with no notice. The State of New York was given no notice that these one hundred and seventy nine (179) people would be on the street without jobs. These one hundred and seventy nine (179) people did not get the additional opportunity and training that could have been otherwise available. These one hundred and seventy nine (179) people's families suddenly had to find a way to make it without an additional salary or the time necessary to adjust. The purpose of the WARN Act and

NY WARN Act was to help these people, but the Defendant callously and illegally refused them WARN notice, and the only reason provided was that the Casino's management speculated that they could not trust these kitchen workers, wait staff, stewards, hosts, and other manual laborers once they were notified of the impending termination.

B. The Aqueduct Buffet was an operating unit

The Supreme Court and the Second Circuit have not issued any decision interpreting what an "operating unit" under the WARN Act should mean in a similar circumstance. The Department of Labor issued regulations which elaborate and define the phrase, as well as providing guidance and examples to consider. When looking at the legislative history, broad intent, and facts of this case, Plaintiffs believe that there is no question that the Aqueduct Buffet constituted an "operating unit." Plaintiffs urge this Court to adopt a definition of operating unit which would include a restaurant with its own dining room, staff, menu, kitchen, storage areas, managers, cost center, and advertisements, such as the Aqueduct Buffet.

Both the WARN Act and NY WARN Act define an Operating Unit in near identical terms. The WARN Act defines it as "an organizationally or operationally distinct product, operation, or specific work function within or across facilities at the single site." 20 C.F.R. § 639.3(j). Under the NY WARN Act, an "[o]perating unit means an organizationally or operationally distinct product, operation, or specific

work function within or across facilities at a single site of employment." N.Y. Comp. Codes R. & Regs. tit. 12, § 921-1.1(k). The "[Department of Labor] has defined these terms in a manner which attempts to define physically and operationally distinct entities for purposes of determining whether a plant closing, the shutdown of a distinct entity, has occurred." 54 Fed. Reg. 16042(j) p 14 of 47, SA35.

The Department of Labor provides numerous examples of operating units, although none involving a casino or similar business model. Those provided indicate that the Aqueduct Buffet was an "operating unit." In considering whether a hypothetical twenty-four (24) hour store's operating units would be based on shifts of job assignments, commenters on the regulations "disagreed that all warehouse and stock workers would necessarily constitute an operating unit." 54 Fed. Reg. 16042(j) p. 15 of 47, SA36. "They suggested that whether such workers would be defined as an operating unit would depend on the employer's organization." Id. "If the store were organized by product departments, the departments would be the operating units and the stock workers would be assigned to those units." Id. "DOL agrees that, in the situation posited, the product departments are the operating units." Id. Here, the product departments for the Casino were the different restaurants, including "RW Prime (an upscale steakhouse); Genting Palace (a Chinese food restaurant); a Food Court, offering more than seven fast food options; Bar 360 (a bar which also served casual food); a Banquet operation (where special events were

held); and two buffets – the New York Racing Association Buffet ("NYRA Buffet") and the Aqueduct Buffet." Eller Affidavit ¶3, A475-6. Each of these separate restaurants would constitute "an organizationally or operationally distinct product [or] operation" as they clearly offered different products and were organized, even by their President in his affidavit filed with the District Court, into distinct operations. 20 C.F.R. § 639.3(j).

Similarly, although there may be common titled employees across different units, the organization will determine what the operating unit is. "Whether maintenance, clerical or housekeeping workers will be considered as an operating unit will depend on how they are organized and how they operate." 54 Fed. Reg. 16042(j) p. 15 of 47, SA36. "If there is a separate maintenance or housekeeping department or a central clerical pool, the workers in those units will be in separate operating units." Id. "If the workers are assigned to other distinct departments, for example, if different clerical workers work exclusively in several distinct departments, the workers will be considered assigned to those departments." Id. Similarly, the Aqueduct Buffet's servers, hosts, bus-people, cooks, chefs, and stewards were organized into their distinct restaurants, including the Aqueduct Buffet. A850-2; Netter Depo p. 72:2-18, 121:6-20, A86, 97.

In implementing the regulations, the Department of Labor also specifically included support workers, clarifying that "[t]he reason for the use of the term

'operating unit" in WARN is to apply the protections of the law to small units of workers in a larger plant when their units are closed. It is not relevant to this purpose whether the workers are production workers or support workers; their job loss and their need for protection is as real in either case." 54 Fed. Reg. 16042(j) p. 15 of 47, SA36. Here, the workers in the stewarding department, *garde manje* and warehouse were support workers for the various operating units and their terminations occurred solely due to the closing of the Aqueduct Buffet. Netter Depo. p. 110:4-112:20, A274. This also undermines the District Court's conclusion that reliance on other workers or units within the Casino should be considered as a factor weighing against Plaintiffs' claims, as the regulations explicitly contemplate that operating units will work with other operating units or even solely support other operating units within a company without removing the WARN Act and NY WARN Act protections.

All evidence points to the Aqueduct Buffet being a distinct unit from the others, including Defendant's own paperwork. Defendant's "List of employees laid off on Jan 06, 2014" has as the "Home Department" for those employees working exclusively within the restaurant as either "Buffet" or "Buffet – Culinary." A850. When preparing their notice to employees, Defendant referred to the "buffet department" in each of their draft documents. Draft RRWCNYC Reduction in Force Notice, A793; Faq's, A794; Notice of Layoff, A796; Voluntary Settlement Agreement, A805. The Notice of Layoff sent to terminated employees stated that

"employees working in the buffet department or in roles supporting the buffet will be permanently laid off." Notice of Layoff to Judith Allen dated January 6, 2014, A815. The Collective Bargaining Agreement, which applies to all of the employees within the Food and Beverage Department, provides severance pay should the units within that department close, listing "restaurant, department or a concession" as the units within the department. A884. That severance was paid to Plaintiffs due to the Aqueduct Buffet closing. Eller Affidavit ¶13, A479-80.

There is a completely separate management structure for the buffet that reports to the Food and Beverage Department. See A1220-1. That structure is independent from the other operating units within the department. "The manager of the buffet would write the schedule" for employees working within the buffet and approve changes to those schedules. Netter Depo p. 72:2-73:23, A86-7. There was a chef that managed the kitchen at the buffet who worked with the Executive Chef to prepare the menu for the buffet. Id. p. 74:3-22, A88.

These distinctions meet the requirements for what the WARN Act and NY WARN Act would characterize as an operating unit. The District Court concluded the opposite citing the Aqueduct Buffet's reliance on the Casino for manuals, hiring, limited food preparation, purchasing, warehousing, advertisement, and accounting. SA9-13. That reliance, however, is not a factor in any portion of the regulations or commentary on the regulations. Instead, WARN Act protections are triggered if a

"department, operation or major work function has been terminated", without regard for whether it supports or is supported by other operating units. 54 Fed. Reg. 16042(j) p. 15 of 47, SA36.

The District Court seems to have accepted Defendant's argument that the operating unit was the "food and beverage" department, citing their union contract and the decision of an arbitrator. SA14-6. This argument, if analogized to a manufacturer, logically fails. If the Defendant operated a factory, then the Aqueduct Buffet would have been producing a single "product" which had to be purchased directly by the consumer. That "product" may have required inputs from other operating units, it may rely on the centralized support of the company, and it may have shared employees, however, if when it closed the manufacturer no longer produced the "product," then it perfectly fits the definition of an operating unit as defined by the regulations. That is precisely what occurred here, as after the closure Defendant no longer offered the all you can eat Aqueduct Buffet product. In this analogy, the entire factory would have to close to trigger notice, something which the WARN Act and NY WARN Act did not intend given the definition of operating unit. There is no question in law or fact that the Aqueduct Buffet was an operating unit and this Court should reverse the District Court's decision.

C. The Aqueduct Buffet constituted a single site of employment

The WARN Act and NY WARN Act both apply to closures of a single site of employment. 29 U.S.C. § 2101(a)(2); NYLL §860-a(6). The District Court rejected this argument in a footnote. Memo and Order p. 8 n. 3, SA8. While the number of employees threshold for application varies between the two laws, both define single site almost identically. Both acts state that a single building may have numerous single sites of employment within a single building, such as an office building. See 20 C.F.R. §639.3(i)(2); N.Y. Comp. Codes R. & Regs. tit. 12, § 921-1.1(p)(1)(vi). "The term 'single site of employment' may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable." 20 C.F.R. §639.3(i)(8).

Here, the "single site" was the restaurant which lost all of its employees, totaling 108 who were assigned to work in the buffet almost exclusively. A850-2. Of those, seventy six (76) were full time employees. Id. Thus, even only considering those employees assigned to work within the Aqueduct Buffet almost exclusively, the shutdown would qualify as a plant closing due to the shutdown of a single site of employment. 29 U.S.C. §2101(2). Just as in the example of an office building, Defendant had multiple restaurants open within the Casino, each with their separate

dining areas, kitchens and staff. These are each single sites which would be subject to WARN notice.

The Department of Labor provides an anecdote which should guide the Court. "[W]here two plants are clearly separate, that is, where they produce distinct products, have different workforces and have separate management at the plant level" then each is a single site of employment. 54 Fed. Reg. 16042(i) p. 13 of 47; SA34. Here, the Aqueduct Buffet had its own dining room and kitchen, its own workforce, and its own "plant level" management. The Court should adopt a definition of single site of employment to include situations such as this and confer the protections of the WARN Act and NY WARN Act on employees in this and future similar situations.

## II. THE EXPERT REPORT OF BJORN MALMLUND SHOULD BE HELD TO BE INADMISSIBLE UNDER FRE 702

The District Court held that, while Mr. Malmlund "in his analysis of whether the Aqueduct Buffet was an operating unit … did not set forth definitions for certain terms or explain specifically how he came up with the factors" he used, the District Court none the less would consider it in making its decision. Memo and Order p. 20, SA20. This was the first time that Mr. Malmlund had ever offered his opinion of the definition of operating unit under the WARN Act or NY WARN Act, his methodology is vague other than three dictionary definitions, and he redefined the

term "operating unit" as an "independent operating unit." Expert Report A1312-31.

Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "[O]pinions which would merely tell the jury what result to reach" are not admissible. Fed. R. Evid. 704, 1972 Advisory Committee Notes. This Circuit has recognized that the District Courts "must be especially careful not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law." Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 511 (2d Cir. 1977) *cert. denied*, 434 U.S. 861 (1977) (citing La Chemise Lacoste v. Alligator Company, Inc., 59 F.R.D. 332, 333 (D. Del. 1973)). "As a general rule an expert's testimony on issues of law is inadmissible." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) (citing Note, Expert Legal Testimony, 97 Harv. L. Rev. 797 (1984)). Expert opinions are not admissible which are "calculated to 'invade the province of the court to determine the applicable law and to instruct the jury as to that law.'" United States v. Scop, 846 F.2d 135, 140 (2d Cir. 1988) *modified*, 856 F.2d 5 (2d Cir. 1988) (quoting FAA v. Landy, 705 F.2d 624, 632 (2d Cir.), *cert. denied*, 464 U.S. 895 (1983)).

Mr. Malmlund's opinion, based on dictionary definitions and the result of no delineated principle or method, concludes what the Court and the ultimate fact finder should find as to the question of whether the Aqueduct Buffet was an operating unit under the WARN Act and NY WARN Act. Expert Report p. 19, A1330 ("It is inappropriate to consider the buffet as an 'operating unit.'"). Indeed, this is the sole conclusion which the Court draws to justify dismissal of the Amended Complaint. Memo and Order p. 21, A1402 SA21 ("[T]he Court concludes Resorts World has sufficiently proven that the Aqueduct Buffet was not an operating unit … [t]herefore, plaintiffs' motion for summary judgment is DENIED and Resorts World's cross motion for summary judgment is GRANTED."). Permitting Mr. Malmlund's report to be considered essentially asks his opinion as to whether Plaintiffs' claim has merits, rather than a factual matter in relation to that question. Further, Mr. Malmlund's opinion completely rewrites the WARN Act and NY WARN Act, explicitly redefining the "operating unit" to be an "independent operating unit." Expert Report p. 7, A1318. Mr. Malmlund's report is that of a paid expert, reporting on a topic which he has never previously considered, using undefined methods, redefining the law, in order to advocate for his client in a conclusory manner. The District Court's decision to consider this opinion should be overturned.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court (1) reverse the District Court's decision granting Defendant summary judgment, (2) reverse the District Court's decision denying Plaintiffs' summary judgment, (3) reverse the District Court's decision that the expert report of Bjorn Malmlund was admissible, and (4) remand the matter for further proceedings, including class certification and determination of damages.

Dated: Astoria, New York
    June 17, 2021

**PHILLIPS & ASSOCIATES PLLC**

      /s/Jesse C. Rose
Jesse C. Rose, Of Counsel
*Attorney for*
*Plaintiffs-Appellants*
45 Broadway, Suite 430
New York, New York 10006
(212) 248-7431

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit of Fed. R. App. P. [*insert Rule citation; e.g., 32(a)(7)(B)*]] [the word limit of Fed. R. App. P. [*insert Rulecitation; e.g., 5(c)(1)*]] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) [and [*insert applicable Rule citation, if any*]]:

   ☑ this document contains *6322* words, **or**

   ☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this document has been prepared in a proportionally spaced typeface using [*Microsoft Word*] in [*Times New Roman, 14 Font*], **or**

   ☐ this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

   (s) __/s/Jesse C. Rose_____

   Attorney for _Appellants-Plaintiffs___

   Dated: __June 18, 2021_____