# 21-833-cv

## United States Court of Appeals

*for the*

## Second Circuit

GERALD ROBERTS, STEPHEN JOHNSON, CHRISTOPHER MCLEOD,
DAVID SHAW, on behalf of themselves and all others similarly situated,
SENECA SCOTT, LATANYA MARTIN-RICE, MARLENNI MINAYA,
ROGER SIERRA, ANNE GRONATA, THOMAS DORGAN, LAURA
SANCHEZ, JOHNNY MURILLO, WILLIE BALLENTINE, ISABEL PENA,
SORWAR HUSSAIN, ANITA JOHNSON, PETER VONTAS, LORNA BENT,
JAMAL AHMED, CHRISTOPHER HUMPHRIES, WILLIAM BOONE, ANA
MOREIRA, MICHELLE LATIMER, VISHWANI SUKHRAM, FELIX
GONZALEZ, JOEVEN CORTEZ, CAMARCA FLOWERS, SYED A. HAQUE,
IRENE TSOROROS, CHRISTINA LAMBRU , SANDRA MILENA-
MARTINEZ, YOON SUNG KIM, MARIA DIAZ, OLIE AHMED, BRUCE
SMITH, ANTONIO SALCEDO, NATALIO HERRERA, LISA LUNDSREN,
CONRAD HALL, CYNTHIA DURAN, CELESTE BROWN-POLITE, JUDITH
ALLEN, LUZ OSPINA, ABIGAIL APPIAH-OTCHERE, BETSABE TORRES,
TERESA AREVALO, OSMOND WALKER, MARINO CANO, ERIC LEE,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

DANA M. SUSMAN
JONATHAN M. SABIN
KANE KESSLER, P.C.
*Attorneys for Defendant-Appellee*
600 Third Avenue, 35th Floor
New York, New York 10016
(212) 541-6222

DALIA TOPPIN, NESTOR AMAYA, ALLEN CHERFILS, JOSEPH BROWN, AHMED TALHA, JASPER JONES, JEFFREY WILKINS, LUCY MUNOZ, VARISE WALLER, SOOKIA FREEMAN, GUIDO ANTONIO RODRIGUEZ, RADIKA KANHAI, DWIGHT CURRY, RAWLO BENFIELD,

*Plaintiffs-Appellants,*

– v. –

GENTING NEW YORK LLC, DBA Resorts World Casino New York City,

*Defendant-Appellee.*

# **RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant/Appellee Genting New York LLC d/b/a Resorts World Casino, New York City ("Resorts World") makes the following disclosure:

Genting Americas, Inc., a privately held Delaware corporation, is the parent corporation of Resorts World and no publicly held corporation owns 10% or more of Resorts World's stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF THE ISSUES ........................................................................ 1

STATEMENT OF FACTS ................................................................................. 2

    Background ...................................................................................................... 2

    The CBA .......................................................................................................... 3

    Operation of Resorts World............................................................................ 4

    Organization of Resorts World ......................................................................10

    The Interest Arbitration Award......................................................................11

SUMMARY OF THE ARGUMENT .................................................................15

APPLICABLE STANDARD .............................................................................18

I.     THE DISTRICT COURT CORRECTLY FOUND THAT
      THE AQUEDUCT BUFFET WAS NOT AN OPERATING
      UNIT UNDER THE WARN ACT ................................................................20

    A.    Introduction ........................................................................................20

    B.    The District Court Correctly Found that the Aqueduct
        Buffet was not Operationally Separate and Distinct ...............................22

        1.    The CBA Does not Identify the Aqueduct Buffet as an
            Operating Unit....................................................................................22

        2.    Undisputed Facts Demonstrate that The Aqueduct
            Buffet was not Operationally Separate and Distinct.......................24

3.    The District Court Correctly found that the Aqueduct
      Buffet was not Organizationally Separate and Distinct...................31

C.    Plaintiffs do not Refute or Address that the Office of the
      Impartial Chairman Determined that the Aqueduct Buffet
      is not Separate and Distinct.....................................................................33

D.    The District Court Properly Considered Resorts World's
      Expert Opinion that the Aqueduct Buffet was not an
      Operating Unit According to Accepted Business Practices ....................37

1.    Standard for Expert Evidence...........................................................37

2.    The Qualifications and Opinions of Resorts World's Expert ..........39

3.    The Court Properly Considered Mr. Malmlund's Opinions ............44

II.   THE DISTRICT COURT CORRECTLY REJECTED
      PLAINTIFFS' ARGUMENT THAT THE AQUEDUCT
      BUFFET WAS A SINGLE SITE OF EMPLOYMENT .................................46

CONCLUSION ................................................................................................48

# TABLE OF AUTHORITIES

Page(s)

Cases

1077 Madison St., LLC v. Daniels,
   954 F3d 460 (2d Cir. 2020).....................................................................19

Alexander v. Gardner-Denver Co.,
   415 U.S. 36 (1974)...................................................................................37

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986).................................................................................20

Boguslavsky v. Kaplan,
   159 F.3d 715 (2d Cir. 1998)....................................................................37

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986).................................................................................19

Daubert v. Merrell Down Pharms., Inc.,
   509 U.S. 579 (1993).............................................................................38, 39

Fuente v. Scag Power Equip. – Div. of Metalcaft of Mayville, Inc.,
   2019 WL 3804735 (E.D.N.Y. Aug. 13, 2019)........................................39, 41

Hilaire v. DeWalt Indus. Tool Co.,
   54 F.Supp.3d 223 (E.D.N.Y. 2014).......................................................44, 45

Kumho Tire Co., Ltd. v. Carmichael,
   526 U.S. 137 (1999).................................................................................39

Major League Baseball Props., Inc. v. Salvino, Inc.,
   542 F.3d 290 (2d Cir. 2008)....................................................................38

Meiri v. Dacon,
   759 F.2d 989 (2d Cir. 1985)....................................................................20

Scotto v. Almenas,
  143 F.3d 105 (2d Cir. 1998)............................................................19

United States v. Herron,
  2014 WL 1871909 (E.D.N.Y. May 8, 2014) ....................................39

United States v. Raniere,
  2019 WL 2212639 (E.D.N.Y. May 22, 2019) ............................38, 39

Wallace v. Buttar,
  378 F.3d 182 (2d Cir. 2004)............................................................36

Westerbeke Corp. v. Daihatsu Motor Co.,
  304 F.3d 200 (2d Cir. N.Y. 2002) ...................................................36

White v. ABCO Eng'g Corp.,
  221 F.3d 293 (2d Cir 2000)............................................................19

Wills v. Amerada Hess Corp.,
  379 F.3d 32 (2d Cir. 2004)..............................................................38

Statutes

29 U.S.C. § 2101...........................................................................2, 3, 4
29 U.S.C. § 2101(a)(2)....................................................................20, 46
29 U.S.C. § 2102(a) ..............................................................................20
NYLL § 860-a ..............................................................................2, 20
NYLL § 860-a(6) ...........................................................................20, 46

Rules

Fed. R. Civ. P. 56(a) ............................................................................19
Fed. R. Civ. P. 56(c) ............................................................................19
Rule 702 of the Federal Rules of Evidence ...................................*passim*

Regulations

12 NYCRR 921-1.1(p)(v) ....................................................................47
20 C.F.R. § 639.3(i)(3)........................................................................47
20 C.F.R. § 639.3(j) .............................................................................21
54 Fed. Reg. 16042 .......................................................................passim

## STATEMENT OF THE ISSUES

1.     Whether the District Court Correctly Found, based on the Undisputed Facts Presented, that the Aqueduct Buffet was not an Operating Unit to which the Federal and New York WARN Acts apply:   Yes.

2.     Whether the District Court Correctly Found, based on the Undisputed Facts Presented, that the Aqueduct Buffet was not a Single Site of Employment to which the Federal and New York WARN Acts apply: Yes.

3.     Whether the District Court Properly Considered the Testimony of Defendant Appellee's Expert Under FRCP 702: Yes.

Defendant/Appellee Genting New York LLC d/b/a Resorts World Casino, New York City ("Resorts World"), submits this Brief in opposition to the appeal of the Decision and Order of the Honorable Judge I. Leo Glasser of the United States District Court for the Eastern District of New York dated March 12, 2021 (the "Decision and Order") granting summary judgment in favor of Resorts World and dismissing all of the claims of Plaintiffs/Appellees ("Plaintiffs") against Resorts World for violation of the Federal and New York Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et. seq.* and NYLL § 860-a *et. seq.* (collectively, the "WARN Act").

## STATEMENT OF FACTS[1]

### Background

Resorts World opened in 2011 and operates as a casino in Queens, New York, then offering approximately 5,000 games. (JA 475) Resorts World also has over 70,000 square feet of space available for private events and 100,000 square feet of outdoor space overlooking the Aqueduct Racetrack, also available for private events. (Id.) As an amenity to its casino guests, Resorts World offers numerous food options which are often provided at steep discounts, if not

---

[1] The following facts are undisputed by Plaintiffs, notwithstanding their improper objection to some as "not material." (JA 1385) "JA" refers to the Joint Appendix.

complimentary, in an effort to attract customers to the casino games and induce them to remain on the premises to maximize gaming activities. (Id.)

In or around July 2010, prior to the opening of Resorts World, the New York Hotel and Motel Trades Council, AFL-CIO (the "Union") commenced efforts to organize Resorts World's future non-management employees. (JA 476) Thereafter, the Union and Resorts World entered into a card check and neutrality agreement (the "Neutrality Agreement"), pursuant to which the Office of the Impartial Chairman was designated as "Interest Arbitrator" to preside over all matters between Resorts World and the Union. (Id.) On December 20, 2011, the Interest Arbitrator certified that the Union had obtained a majority of the cards selecting the Union as the exclusive bargaining representative for all non-management job classifications, including the Plaintiffs, and the Collective Bargaining Agreement ("CBA") was entered into. (Id.; JA 503)[2]

**The CBA**

The applicable CBA does not identify the Aqueduct Buffet (or any other food outlet) as a separate department, division or unit of Resorts World. (JA 853) Rather, that agreement sets forth job classifications and descriptions for all of Resorts World's non-managerial employees, as well as uniform salary structures,

_____

[2] Plaintiffs do not dispute that they were all Union Members.

benefits, policies and terms of employment for each non-managerial job classification. (JA 887) Pursuant to the CBA, Plaintiffs, who consists of former Cooks, Food Servers, Food Runners, Bussers, Hosts, Cashiers, Stewards and Warehousemen, had the same job description regardless of food outlet, had the same salary and benefit structure regardless of food outlet, had the same overtime policy regardless of food outlet, had the same vacation, sick days and holidays, regardless of food outlet, and were subject to the same training, policies and all other terms of employment, regardless of food outlet. (JA 887-88) The CBA also reflects that because job classifications performed the same or similar duties across all food outlets, jobs were transferable throughout Resorts World's facility. (Id.)

**Operation of Resorts World**

Resorts World offered over 30 food and beverage options, including: RW Prime (an upscale steakhouse); Genting Palace (a Chinese food restaurant); a Food Court, offering more than 7 fast food options; Bar 360 (a bar which also served casual food); a Banquet operation (where special events were held); and two buffets – the New York Racing Association Buffet (the "NYRA Buffet") and the Aqueduct Buffet. (JA 475-76) Both buffets provided a variety of similar all-you-can-eat choices in exchange for a required fee. (JA 484) All of the food options available at Resorts World were organized and managed under its Food and Beverage department. (JA 491)

Resorts World employed over 25 job classifications in the Food and Beverage department, including: Cooks, Food Runners, Food Servers, Bussers, Hosts, Cashiers, Warehousemen and Stewards. (JA 476) The descriptions for each job classification were virtually identical across all of the food outlets within the Food and Beverage department. (JA 887-88) Stewards and Warehouseman fell under different departments, because they serviced Resorts World's entire facility, not just the food and beverage outlets.  (JA 476) Cooks, Food Servers, Food Runners, Bussers, Hosts, Cashiers and Stewards were assigned to different food outlets, depending on need.  For example, according to the deposition testimony of Randy Netter, Resorts World's Director of Food and Beverage, Stewards regularly rotated through all of the food and beverage outlets on a regular basis: "[T]he stewards would rotate through different outlets within food and beverage . . . the stewards that worked overnight cleaned all of the kitchens, so they worked their eight-hour shift and went through the food court kitchens, the restaurant kitchens, the buffet kitchens, they cleaned them all." (JA 256-57) Mr. Netter further testified that as of the end of 2012, **all Stewards** on a particular shift were assigned to different areas of Resorts World on a daily basis. (JA 273) Plaintiffs admit that they were often times assigned to work at different food and beverage outlets and were recruited to perform a general function of the Food and Beverage department not specific to the Aqueduct Buffet. For instance, Plaintiff Eric Lee testified: "Q.

[W]ere all of those other people seeking jobs in the food and beverage department or other departments as well? A. From what I know they were all in the food and beverage department. Some were applying to be cooks, some were applying to be chefs, some were applying to be cashiers . . . . Q. And it was the same situation as yourself where they didn't know where they would ultimately be placed? A. They knew what position they wanted, they didn't know what kitchen they will be placed . . . ." (JA 333). <u>See also</u> (JA 353) ("Q: And when you said earlier that you were put in multiple kitchens so you could learn what goes on in each of those, did you actually work in each of the kitchens? A. Yes."); (Pl. Br. at 9 citing JA 97); (JA 305-06); (JA 351-52).

With regard to Cooks, Mr. Netter testified that "[t]he culinary manual is for the entire culinary outlets no matter where you work in the building, so yes, they were trained for the culinary skills of the building." (JA 259) Concerning the Executive Sous Chefs, Mr. Netter testified that they "[o]versee quality of product, preparation of product, following of recipes, following policies and procedures, SOPs, steps of service, those sorts of things." (JA 267) When asked if those duties were performed primarily in the Aqueduct Buffet, Mr. Netter responded, "[t]hey all help each other everywhere . . . [r]otating all day long, walking through different kitchens . . . everywhere they go." (JA 267) As to both Chefs and Managers for each outlet, Mr. Netter testified that they also worked in different

6

food outlets, depending on need: "Q: [I]f a situation arose where [managers] were needed somewhere else, they would be assigned to a different location? A. Yes. Q. [W]as that the same for the chef as well? A. Yes." (JA 259)

The Aqueduct Buffet was entirely dependent upon Resorts World's centralized services and could not operate in their absence. For example, a cold kitchen, referred to in the industry as a "Garde Manger," is a centralized kitchen that supplied all food outlets with certain items. (JA 480) Cooks working in the Garde Manger prepared and delivered to all of the food outlets throughout Resorts World vegetables, salads, cold cuts, sushi and pizza dough. (JA 260-61; 480) The Garde Manger also prepared the same salads, fruit cups and dumplings that were offered in all of Resorts World's food outlets. (JA 261; 480-81) The Food and Beverage department used common recipes across all food and beverage outlets and many of the food items offered in the Aqueduct Buffet were offered in Genting Palace, the NYRA Buffet as well as other outlets. (JA 280; 483) As described above, Resorts World operated two buffets with the same all-you-can-eat type options, with similar offerings. (JA 475-76) Therefore, the food products available in the Aqueduct Buffet were not distinct, but followed common recipes and were prepared, in significant part, by the centralized Garde Manger.[3]

---

[3] Of the 177 employees laid off, approximately 18 of them worked in the Garde Manger, not the Aqueduct Buffet. (*See* JA 850-52)

7

The Aqueduct Buffet did not purchase its own food. (JA 481) All the food offered in the Aqueduct Buffet, and every other food option, was purchased through Resorts World's central Purchasing department. (JA 251-52; 481) The Purchasing department purchased everything needed to operate Resorts World's entire business, from gaming equipment, to paper clips, to butter. (JA 481) Employees in the Purchasing department determined what items were needed for the entire facility and set re-ordering levels for every item. (JA 481) All the common food items used in every food and beverage outlet, such as chicken cutlets, flour and salt, was purchased in bulk by the Purchasing department and stored in a centralized Warehouse. (Id.) Food was not ordered specifically for the Aqueduct Buffet. (Id.)

Everything purchased through Resort World's Purchasing department was delivered to and stored in a centralized Warehouse, located separate from the Aqueduct Buffet. (JA 252; 481) The Warehouse stored all perishable and non-perishable items needed to operate Resorts World's entire business. (JA 481) Personnel from across Resorts World's facility would request items from the Warehouse as needed through Resorts World's computerized Ariba system, and Warehouse Personnel would deliver such items. (Id.)

The Aqueduct Buffet also relied on the services and support of the Stewarding department in order to operate. (JA 482) As noted above, Stewards are

responsible for cleaning and maintaining Resorts World's entire facility, including the casino, administrative offices, event spaces, and food outlets and regularly rotate throughout Resorts World's buildings pursuant to a schedule. (Id.) Stewards report to a "Shift Manager," who is different from the managers of any particular area. (JA 270; 482)[4] Resorts World also has a centralized Environmental Services department ("EVS") which provides special cleaning services in accordance with local and federal regulations for large equipment and also rotates throughout Resorts World's entire the facility, as required, including the Aqueduct Buffet. (JA 257-59; 482) In addition to the Garde Manger, Purchasing department, Warehouse department, Stewarding department, and EVS department, the Aqueduct Buffet also relied on the following centralized services of Resorts World to function (JA 482):

- Marketing - Marketing efforts are centrally led to draw in patrons to Resorts World's casino operations. Amenities, such as food options, may be included in the Resorts World's marketing to lure patrons with a coupon to one of the food outlets. (JA 482; 227)

- Human Resources – The centralized human resources department handles all aspects of the administration and personnel efforts for the entire company, including the Aqueduct Buffet, relating to hiring, firing and discipline, compensation and benefits administration, compliance, training and development, employee evaluations, maintenance of personnel files and employee relations. Human Resources utilized standard applications and job descriptions for hiring. (JA 482; 227)

---

[4] Of the 177 employees laid off, approximately 50 of them were Stewards. (JA 482; 850-52)

- <u>Legal</u> – Resorts World's centralized legal department handles all legal aspects of the entire company, including the operation of the Aqueduct Buffet. (JA 483; 227)

- <u>Payroll and Accounts Payable</u> – Resorts World centrally processes payroll for all of its employees, using an outside vendor to assist with this function. All payments for items ordered and all expenses incurred throughout Resorts World entire facility were centrally made by the accounts payable department. (JA 483; 227)

## Organization of Resorts World

The Food and Beverage department had a common management structure that included all of the food outlets. As seen in the organizational charts contained in the Affidavit of Ryan Eller (the President of Resorts World) in Support of Defendant's Motion for Summary Judgment, dated December 4, 2015 (JA 474 at 491-94) and the Expert Report of Bjorn J. Malmlund, dated May 8, 2015 (JA 215 at 225), all 30 of Resorts World's food outlets were collectively managed by an Executive Chef and Assistant Director of the Food and Beverage department. Those two positions reported to the Director of Food and Beverage – Randy Netter. (JA 484; 493)  Mr. Netter reported up to Resorts World Chief Operating Officer, the first layer decision-maker, who then reported to the President of Resorts World. (JA 484) Below the Executive Chef and the Assistant Director of Food and Beverage were various positions that had authority over either all or many of the food and beverage options. (JA 484; 494)

Mr. Netter testified, and it is not disputed, that: both he and the Executive Chef oversaw all thirty food and beverage outlets and determined what food was served at all of them. (JA 265); the Executive Sous Chefs supervised and performed managerial services, such as overseeing quality of product and following policies and procedures, for every food outlet – "rotating all day long, walking through different kitchens" (JA 267); the single "Beverage Manager" of the Food and Beverage department oversaw and ordered "all the beverage that comes into the central warehouse for distribution to all outlets that use beverage" (JA 269); and all Stewards "reported to the one shift manager who oversaw **all the areas**" (JA 270) (emphasis added).

Based on the foregoing undisputed facts, the Aqueduct Buffet was operated through management common to the Food and Beverage department.

**The Interest Arbitration Award**

On or about October 18, 2013, the Interest Arbitrator issued an award (the "Interest Arbitration Award") which resolved certain unsettled terms of the CBA between the Union and Resorts World, including employee wage increases and a schedule of annual wage increases from October 18, 2013 through 2017, as well as and increases in pension and health benefits and holidays, vacation days and sick days. (JA 477; 508) The Interest Arbitration Award took immediate effect, nearly doubled employee wages for Union members and drastically increased health and

11

pension benefits by more than 20%. (JA 477; 508) For example, prior to the Interest Arbitration Award, a Food Runner working in any of Resorts World's food and beverage outlets earned $9.54, per hour; immediately upon the issuance of the Interest Arbitration Award, that Food Runner earned $20.50 per hour; and by October 2017, that same Food Runner would earn $29.38, per hour. (JA 477; 508) Similar increases were required for virtually every non-managerial job classification. (JA 477) Thus, the impact of the Interest Arbitration Award was immediate and catastrophic. (JA 477)[5]

In an effort to mitigate the extraordinary and immediate impact of the Interest Arbitration Award, Resorts World promptly took several measures across all aspects of Resorts World's business, such as reducing complimentary benefits to patrons, reducing advertising expenses, modifying the hours of certain operations and considered increasing the prices of certain amenities, including the food options. (JA 477-78) However, those measures were not sufficient to offset the wage and benefit increases imposed by the Interest Arbitration Award. (JA 478) Recognizing that the only way to regain economic stability was a reduction of

---

[5] The impact was particularly severe in light of the fact that Resorts World's gross gaming revenues are taxed at the rate of nearly eighty (80%) percent, severely limiting the revenues available to offset the meteoric increase in labor costs resulting from the Interest Arbitration Award. (JA 477)

labor, Resorts World promptly commenced negotiations with the Union regarding both the number and process for certain layoffs. (JA 478)

From approximately November 2013 through the first week of January 2014, Resorts World negotiated with the Union concerning proposed layoffs of non-managerial job classifications. (JA 478; 704-90) Those negotiations took place between representatives of Resorts World and the Union, including each side's counsel, and occurred nearly daily in the form of personal meetings, telephone calls, and emails. (JA 478; 704-90) As a result of the negotiations, Resorts World and the Union agreed to reduce the number of proposed layoffs from over 300 to approximately 177 by, inter alia, closing the Aqueduct Buffet and reducing other personnel by seniority. (JA 478-79; 791) The Union had knowledge of, actively participated in, negotiated and approved the decision to close the Aqueduct Buffet, the number of layoffs, the list of employees to be laid off by name and position, the timing of the layoffs, and the timing and content of the notices provided to affected employees. (JA 478-79; 791)

After agreement was reached with the Union, on January 6, 2014, Resorts World closed the Aqueduct Buffet and laid off approximately 179 employees, including Plaintiffs. (JA 479) The job classifications affected included Cooks, Food Servers, Food Runners, Bussers, Hosts, Cashiers, Warehouseman and Stewards. (Id.) Many of the laid off employees either never worked in the

13

Aqueduct Buffet or only worked in it as part of a regular rotation among the various other food outlets and areas of the casino. (JA 479)[6]  In accordance with the CBA, all laid-off employees received "Regular Severance," as well as other payments required therein. (JA 479-80; 884). In addition, approximately 20 laid-off employees received "Enhanced Severance," provided in exchange for a waiver or release of any claims against Resorts World. (JA 479-80; 889-923)[7]

Notwithstanding that the layoffs were effectuated in cooperation with and approved by their Union, on or about March 17, 2014, Plaintiffs filed the Amended Complaint, alleging that Resorts World violated the WARN Act by failing to give 60 or 90 days' notice, respectively, prior to their layoff.  (JA 480)[8]  The sole ground for Plaintiffs' claim that the WARN Act applies in their Amended Complaint is that the Aqueduct Buffet qualifies as an "operating unit" thereunder.[9]

---

[6]  Indeed, of the approximate 177 employees laid off, approximately 71 did not regularly – or ever – work in the Aqueduct Buffet. (JA 479)

[7]  Enhanced Severance was not required by the CBA. (JA 479-80)

[8]  While Plaintiffs filed their Amended Complaint as a proposed class action, no motion for class certification was ever made or granted.

[9]  Although Plaintiffs now argue that the Aqueduct Buffet may also be a "single site of employment," under the WARN Act, no such allegation was raised in their Amended Complaint, the sole basis of which was that the Aqueduct Buffet was an "operating unit," and that theory is therefore waived. Nonetheless, Plaintiffs' belated argument that the Aqueduct Buffet is a "single site of employment" has no basis in fact or law and was properly summarily rejected by the District Court. (JA 1389) ("Moreover the Court rejects plaintiffs' alternative argument that the Aqueduct Buffet was a single site of employment").

On or about February 16, 2016, both parties' motions for summary judgment were submitted. On or about December 11, 2020[10], the District Court heard oral argument on the parties' cross-motions, and the Decision and Order was issued on March 12, 2021. For the reasons and principles of law set forth below, the Decision and Order is correct and should be upheld.

## SUMMARY OF THE ARGUMENT

The District Court correctly held that there is no genuine issue of fact that the Aqueduct Buffet offered by Resorts World was not an "operating unit" or "single site of employment" under the WARN Act based on the following facts, which Plaintiffs do not – and cannot – dispute: (a) Plaintiffs had generic work functions not specific to the Aqueduct Buffet (JA 226-29; JA 480-88); (b) the operative CBA does not specify the Aqueduct Buffet as a separate operating unit and contained only generic job classifications used throughout Resorts World's various food options with the same job descriptions, training, salary, benefits, policies and terms of employment, regardless of food options (JA 476; 887-88); (c) the Aqueduct Buffet did not have a separate work force, as Servers, Stewards, Bussers, Hosts, Cooks and Warehouse personnel did not work either exclusively – or ever – in the Aqueduct Buffet (JA 479; 482); (d) nearly half of the employees

---

[10] On February 21, 2018, this case was reassigned from U.S. Senior District Judge Sandra L. Townes to U.S. Senior District Judge Leo Glasser.

laid off at the time that the Aqueduct Buffet closed did not work in the Aqueduct Buffet either at all, or except as part of a schedule which included a regular rotation among all food options (JA 479); (e) Resorts World operated a centralized Food and Beverage department, with a common management structure for all food outlets (JA 224-26; 484-86; 491-94); (f) the Aqueduct Buffet was wholly reliant on Resorts World's centralized services for food preparation, cleaning, equipment maintenance, purchasing, storage, hiring, firing, benefit administration, marketing and finance, among other services (JA 226-32; 480-83); (g) the Aqueduct Buffet did not offer distinct products, as it was one of two all-you-can-eat buffet options and contained similar food items available across many food outlets (JA 223-24; 483-84); (h) the Aqueduct Buffet was not financially independent, had no assets or liabilities of its own, and was wholly dependent on Resorts World's casino guests for revenue (JA 230-32; 486-88); (i) no costs for rent, utilities, administrative salaries, insurance or for the centralized services on which it relied were allocated to the Aqueduct Buffet (JA 226-29; 486-88); and (j) the Aqueduct Buffet consistently operated at a loss and was subsidized by Resorts World's casino operations (JA 231-32; 488). These undisputed facts demonstrate conclusively that the Aqueduct Buffet was not an operating unit to which the WARN Act applies and that the District Court correctly dismissed all of Plaintiffs' claims.

Indeed, based on these very facts, the Impartial Chairperson designated to hear disputes between Appellees and Resorts World, found in its Decision dated November 24, 2015 that:

> **[Resorts World] operated a centralized food and beverage department, with a common management structure, under which there were a number of different outlets. Many of the necessary elements of a food and beverage operation were common to all outlets, e.g., hiring, training, stewarding, and supplies and most importantly, jobs with vastly similar elements . . . .**
>
> **I find that the term "department" means a "food and beverage department." Thus, where jobs from one outlet to another are, in the overwhelming main, vastly similar or fungible so as to require little or no training, classification seniority must be given effect.**[11]

(JA 399) (emphasis added)

Without disputing the facts critical to an analysis as to whether an aspect of a business constitutes an "operating unit" under the WARN Act, upon their appeal, Plaintiffs instead make dubious arguments with no legal support and rely on superficial and irrelevant matters inapplicable to the analysis at hand. The critical

---

[11] The Impartial Chairperson's determination is consistent with that of Resorts World's expert, Bjorn Malmlund, a Certified Public Accountant, certified in financial forensics and accredited in business valuation by the American Institute of Certified Public Accountants. Based on his credentials and 27 years of experience, the District Court correctly held that Mr. Malmlund's report and conclusions were properly considered under FRCP 702.

facts remain unchallenged: the provisions of the CBA, the determination of the

Impartial Chairperson, and Resorts World's operation and organizational structure

all confirm the Decision and Order and mandate a finding that the Aqueduct Buffet

was not an operating unit, or a single site of employment, under the Warn Act and

that in any event Plaintiffs' claims are barred by the doctrines of waiver and/or

estoppel.[12]

## APPLICABLE STANDARD

The Court of Appeals reviews "*de novo* the District Court's grant

of summary judgment, taking the facts in the light most favorable to the non-

---

[12] Plaintiffs' claims are barred by the doctrines of waiver and estoppel because
Plaintiffs' exclusive representative and agent – the Union – knew of, actively
participated in, and approved the closure of the Aqueduct Buffet, the number and
identity of the employees laid off, the timing of the layoffs, and the content of the
notices and other information provided to affected employees. (JA 704-90) Thus,
having actively negotiated and approved of the closing of the Aqueduct Buffet and
the notices and timing of the layoffs, Plaintiffs, through their Union, waived their
WARN Act claims under either an express/implied waiver and/or estoppel.
Moreover, approximately 20 laid off workers, including 6 Plaintiffs, received
"Enhanced Severance," which was not required under the CBA, and in exchange
expressly waived "recall rights and legal claims relating to their employment"
through a signed release. (JA 479-80; 889-923) Since the District Court held that
the WARN Act did not apply to the closure of the Aqueduct Buffet, it refrained
from addressing Resorts World's waiver and/or estoppel arguments. Similarly,
Resorts World's argument that punitive damages are not available under the
WARN Act was not addressed by the District Court. In the event the Decision and
Order is reversed or modified, these issues and arguments should be decided by the
District Court.

moving party." 1077 Madison St., LLC v. Daniels, 954 F3d 460, 463 (2d Cir. 2020) (citation omitted).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(a)). The Court's "inquiry focuses on whether the district court correctly applied the substantive law and whether, viewing the evidence in the light most favorable to the plaintiff, there are any genuine issues of material fact necessitating a trial." White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir 2000) (citation omitted). The Supreme Court has interpreted the plain language of Rule 56(c) as mandating "the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not "negate" the elements of the non-movant's claim. Id. at 323. The party opposing the motion for summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation omitted). Rather, the opposing party "must designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quotation and citation omitted). A disputed fact is

material if it affects the outcome of the case, and it is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citation omitted). "The salutary purposes of summary judgment [is to] avoid[ ] protracted, expensive and harassing trials . . . ." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

Applying the foregoing well-established principles reveals that the District Court was correct in all respects.

## I. THE DISTRICT COURT CORRECTLY FOUND THAT THE AQUEDUCT BUFFET WAS NOT AN OPERATING UNIT UNDER THE WARN ACT

### A. Introduction

Both the federal and New York WARN Acts require covered employers to provide certain written notice to any employee or his/her representative who suffers an "employment loss" resulting from a "plant closing" or a "mass layoff." See, 29 U.S.C. § 2102(a); NYLL § 860-a. Plaintiffs' sole argument that the WARN Act applies is that they suffered an employment loss as a result of a "plant closing," rather than a "mass layoff." The WARN ACT defines a "plant closing" as "the permanent or temporary shutdown of a single site of employment, or one or more facilities or **operating units** within a single site of employment." 29 U.S.C.

§ 2101(a)(2); NYLL § 860-a(6) (emphasis added). In their Amended Complaint Plaintiff did not allege that Resorts World shut down a single site of employment or facility. Thus, Plaintiffs' claims are properly construed as based solely on their contention that the Aqueduct Buffet constitutes an "operating unit," as that term is interpreted under the WARN Act.

The United States Department of Labor ("DOL"), has defined an "operating unit" for purposes of the WARN Act, as "an organizationally or operationally distinct product, operation, or specific work function within or across facilities at a single site."  20 C.F.R. § 639.3(j). The DOL has further explained that, "[t]he critical factor in determining what constitutes an operating unit will be the organizational or operational structure of the single site of employment" and that "[s]ources of evidence which will assist in defining separate and distinct units will be applicable CBAs, the employer's organizational structure and industry understandings of what constitute distinct work functions."  54 Fed. Reg. 16042. Applying these principles and sources of evidence, the undisputed facts demonstrate clearly that the Aqueduct Buffet was not an operating unit under the WARN Act.

**B.    The District Court Correctly Found that the Aqueduct Buffet
was not Operationally Separate and Distinct**

The District Court correctly found that the Aqueduct Buffet was not

operationally separate and distinct from the rest of Resorts World's operations

based on, among other things, the undisputed evidence consisting of the CBA, the

deposition testimony of both parties, documentary evidence, and the finding of the

Impartial Chairperson. The District Court's considerations and analysis are sound

and correct.

**1.    The CBA Does not Identify the Aqueduct Buffet as an Operating
Unit**

The CBA (JA 854-88) does not identify the Aqueduct Buffet (or any other

food outlet) as a separate department, division or unit of Resorts World.  Rather,

that agreement sets forth job classifications and descriptions for all of Resorts

World's non-managerial employees, as well as uniform salary structures, benefits,

policies and terms of employment for each non-managerial job classification. (JA

887-88) Pursuant to the CBA, Cooks, Food Servers, Food Runners, Bussers, Hosts,

Cashiers, Stewards and Warehousemen had the same job description regardless of

food outlet, had the same salary and benefit structure regardless of food outlet, had

the same overtime policy regardless of food outlet, had the same vacation, sick

days and holidays, regardless of food outlet, and were subject to the same training,

policies and all other terms of employment, regardless of food outlet. (JA 486;

854-88) Moreover, as discussed below, because job classifications in the CBA are generic, the Impartial Chairperson found that employees have "bumping rights" whereby employees in a particular job classification must be laid off and/or recalled according to seniority, not based on the area(s) where they have worked. (JA 383-400)

Thus, the District Court correctly found that "the CBA does not identify the Aqueduct Buffet, or any other food outlet, as a separate department, division or unit in the casino. Rather, the CBA sets forth the same job descriptions, salary and benefit structure, policies, and terms of employment for cooks, food services, food runners, bussers, hosts, cashiers, stewards, and warehouse attendants, regardless of the food outlet." (JA 1390) Plaintiffs raised no evidence in support of their appeal controverting the language of the CBA, the facts reflected therein or the DOL's guidance that "[s]ources of evidence which will assist in defining separate and distinct units will be . . . **applicable collective bargaining agreements**." 54 Fed. Reg. 16042 (emphasis added)[13]

---

[13] Rather, Plaintiffs make an incomprehensible argument that "[i]f the Defendant operated a factory, then the Aqueduct Buffet would have been producing a single product" which "may have required the inputs from other operating units" and might have "rel[ied] on the centralized support of the company, and it may have shared employees" (Pl. Br. at 23) To the extent this argument is even decipherable, it is completely irrelevant to the language of the CBA as persuasive evidence as to whether an operating unit exists and should be rejected.

### 2.  Undisputed Facts Demonstrate that The Aqueduct Buffet was not Operationally Separate and Distinct

In addition to the CBA, the Court properly considered other undisputed evidence in concluding that the Aqueduct Buffet was not operationally separate and distinct.

Plaintiffs cannot dispute that the Aqueduct Buffet was one of two buffets offered at Resorts World and, therefore, did not offer a distinct product. In addition to the Aqueduct Buffet, Resorts World also operated the NYRA Buffet, which offered an identical all-you-can-eat option in exchange for the payment of a required fee and offered many of the same items to casino patrons. (JA 475-76) Moreover, as detailed below, Resorts World used common recipes across all food outlets and a separate cold kitchen prepared common items for every food outlet, including both buffets. Because two buffets were available, it simply cannot be argued that the Aqueduct Buffet offered a distinct product.

Plaintiffs cannot dispute that many of Resorts World's workers, including Plaintiffs, "rotated among the various food outlets in the casino." (JA 1390) For example: "stewards, who were responsible for cleaning and maintaining the entire facility, reported to the same shift manager on a given shift and regularly rotated throughout the facility pursuant to a schedule." (JA 1390 citing JA 256; 270) According to the deposition testimony of Randy Netter, Resorts World's Director

of Food and Beverage, "the stewards would rotate through different outlets within food and beverage . . . the stewards that worked overnight cleaned all of the kitchens, so they worked their eight-hour shift and went through the food court kitchens, the restaurant kitchens, the buffet kitchens, they cleaned them all." (JA 256-57) Mr. Netter further testified that as of the end of 2012, **all Stewards** on a particular shift were assigned to different areas of Resorts World on a daily basis. (JA 273)

Plaintiffs cannot dispute that that "[t]he culinary manual is for the entire culinary department no matter where you work in the building, so yes, [all Cooks] they were trained for the culinary skills of the building." (JA 259)[14]  Concerning the Executive Sous Chefs, Mr. Netter testified that he "[o]versees quality of product, preparation of product, following of recipes, following policies and procedures, SOPs, steps of service, those sorts of things." (JA 267) When asked if those duties were performed primarily in the Aqueduct Buffet, Mr. Netter responded, "[t]hey all help each other everywhere . . . rotating all day long, walking through different kitchens . . . everywhere they go." (JA 267) As to both Chefs and Managers for each outlet, Mr. Netter testified that they also worked in

---

[14] Indeed, the Aqueduct Buffet was one of two buffets offered at Resorts World (JA 475-76), so Plaintiffs' claim that the Aqueduct Buffet offered a unique product or service is unsupported and contrary to the record evidence.

different food outlets, depending on need: "Q. [I]f a situation arose where [managers] were needed somewhere else, they would be assigned to a different location?  A. Yes. Q. [W]as that the same for the chef as well?  A. Yes."  (JA 259) Thus, the District Court correctly found that "all sous chefs used the same culinary manual 'no matter where [they] worked' in the building, and sous chefs, along with managers, would fill in at other food outlets as needed, such as when there were call-outs during a particular shift" (JA 1390 citing JA 252-53; 259) and that "cashiers, servers and culinary staff would fill in, as needed at the other buffet located in the facility and could sign up to work at special events that took place throughout the facility (JA 1390-91 citing JA 276-77).

Plaintiffs cannot dispute and, indeed admit, that they were often times assigned to work at different food and beverage outlets and were recruited to perform a general function of the Food and Beverage department not specific to the Aqueduct Buffet. Plaintiff Lee testified: "Q. [W]ere all of those other people seeking jobs in the food and beverage department or other departments as well?  A. From what I know they were all in the food and beverage department.  Some were applying to be cooks, some were applying to be chefs, some were applying to be cashiers . . . . Q. And it was the same situation as yourself where they didn't know where they would ultimately be placed? A. They knew what position they wanted, they didn't know what kitchen they will be placed . . . . " (JA 333). <u>See</u> <u>also</u> (JA

26

353) ("Q: And when you said earlier that you were put in multiple kitchens so you could learn what does on in each of those, did you actually work in each of the kitchens? A. Yes."); (Pl. Br. at 9 citing JA 97); (JA 305-06); (JA 351-52).

Plaintiffs cannot dispute that the Aqueduct Buffet was dependent on Resorts World's centralized services. As indicated, the Food and Beverage department utilized common recipes across food outlets, and all common foods were centrally prepared by Cooks in a centralized kitchen called the Garde Manger. For example, cooks in the Garde Manger prepared and delivered vegetables, salads, cold cuts, sushi and pizza dough to all of the food outlets, including the Aqueduct Buffet. Indeed, "the Aqueduct Buffet did not function without the Garde Manger." (JA 1391 citing JA 480). The Aqueduct Buffet did not purchase its own food. (JA 481) All food and other supplies offered throughout Resorts World was purchased through a centralized Purchasing Department and stored in a common Warehouse to store all items used throughout the facility. (Id.) As the President of Resorts World testified, "[t]he Purchasing department acted as the centralized purchasing unit for everything needed to operate Resorts World (not just food items), from paper clips to furniture, to butter," and that "[t]he employees in the Purchasing department determined what items were needed for the entire facility and set re-ordering levels for those items." (JA 1391-92 citing JA 481). All the common food items used in every food and beverage outlet, such as chicken cutlets, flour

and salt, was purchased in bulk by the Purchasing department and stored in the centralized Warehouse. (JA 481) Food was not ordered specifically for the Aqueduct Buffet. (Id.)  Personnel in all areas of the casino "requested stored items through Resort's World's central Ariba System, and Warehouse personnel would deliver such items as needed."  (JA 1392 citing JA 481). As noted, the Stewarding and Environmental Services departments serviced the entire facility, including the Aqueduct Buffet. (JA 482) And, all marketing, human resources, legal, payroll, insurance and accounts payable and administrative and executive services were centralized for the entire facility. (JA 1392)[15]  Indeed, of the people laid off in January 2014, Stewards, Garde Manger, Environmental Services, Purchasing and Warehouse Personal either never worked in the Aqueduct Buffet or did not work in the Aqueduct Buffet exclusively. (JA 479; 482)

Plaintiffs cannot dispute that the Aqueduct Buffet was also financially indistinguishable from the rest of the business, because Resorts World did not track all costs associated with it. Instead, costs were aggregated and allocated across several cost centers, and no shared costs for rent, utilities, maintenance or any of the centralized services described above were allocated to the Aqueduct Buffet.

---

[15] Marketing efforts, for example, included providing coupons to patrons for any of the food outlets or for one specific food outlet when then spent a certain amount of money at the casino. (JA 1392 citing JA 482; 1195)

The Aqueduct Buffet did not have its own discrete set of assets or liabilities. (JA 1400 citing JA 222)

Rather than refuting these critical facts, in support of their appeal, Plaintiffs repeat the same arguments that were properly rejected by the District Court as either unsupported by the record or not material to the analysis at hand. For example, Plaintiffs repeat their assertions that the Aqueduct Buffet was not operationally distinct because it had a separate entrance, that employees who worked in the Aqueduct Buffet wore distinct uniforms, and that the Aqueduct Buffet prepared the "vast majority" of its own food. (Pl. Br. at 7, 10, 12)  Each of these assertions, to the extent they are relevant, are wholly unsupported and, indeed, contradicted by the record and Plaintiffs' brazen repetition of specious allegations without basis should not be countenanced. The record demonstrates that the Aqueduct Buffet was not a walled-off restaurant, but was connected "by the whole place," is "open air" and "you can walk directly into it." (JA 283) The record demonstrates that that the food served in the Aqueduct Buffet was produced by Cooks in the Garde Manger (JA 1133), common recipes were used throughout Resorts Food outlets (JA 483), and there were two buffets (JA 1128);[16] and the

---

[16] The deposition testimony of Randy Netter previously cited for Plaintiffs' dubious assertions in no way supports, or even addresses, who produced a majority of the food serviced the Aqueduct Buffet. *See* (JA 254) (testifying that there are two places within the buffet where people could get food) and (JA 260-61) (indicating

record demonstrates that Cooks, Stewards and Hosts for the entire facility wore the same uniform (JA 279; 1136). Similarly, Plaintiffs' refrain that the Aqueduct Buffet "had its own workforce" is contrary to the generic job classifications set forth in the CBA and ignores the testimony from nearly every witness, including Plaintiffs, that Cooks, Stewards, Warehouseman, Servers, Hosts and Cashiers worked in areas **other than** the Aqueduct Buffet, either exclusively or regularly. Plaintiffs' contention that the Aqueduct Buffet is a distinct operating unit because it had its own cost center is also belied by the following evidence, which Plaintiffs conveniently ignore: "Resorts World did not prepare financial statements that included all of the operating expenses, including allocations of shared costs, for the Aqueduct Buffet" and that Resorts World instead had a "centralized accounting and finance department which recorded and reported financial information for direct costs incurred in the Food and Beverage department on an overall summary basis." (JA 1393 citing JA 486) The District Court properly noted that such allegations "are misleading and/or unsupported by the record," "fail to dispute the CBA's provisions with respect to common job descriptions, training, hiring practices and policies for all non-managerial employees" and "fail to dispute the evidence that the Aqueduct Buffet was dependent on Resorts World's centralized

---

a non-exclusive list of vegetables, all salads, all cold items, fruit, sushi, pizza dough and dumplings were made in the Garde Manger).

services," which are "a critical factor in determining what constitutes an operating unit . . . ." (JA 1393) (citations omitted). In so finding the District Court rejected Plaintiffs' specious contention that centralized services are "not a factor" in determining whether something is an operating unit under the WARN Act:

> The Court rejects plaintiffs' argument that 'there is absolutely no legal authority' that centralized services affect the definition of an operating unit. The DOL clearly stated that '[t]he critical factor in determining what constitutes an operating unit will be the organizational or operational structure of the single site of employment.' 54 Fed. Reg. 16050. Therefore, the facts proffered by Resorts World with respect to centralized services are not only relevant but critical to the determination of whether the Aqueduct Buffet was a separate and distinct unit.

(JA 1394)

Because of its reliance on the foregoing centralized services and rotation of employees with the same job classifications across Resorts World, the Aqueduct Buffet was inextricably intertwined with the management, operation and services of Resort's World's business in general and the District Court correctly found that the foregoing undisputed facts mandated a finding that the Aqueduct Buffet is not an operating unit to which the Warn Act applies.

### 3. The District Court Correctly found that the Aqueduct Buffet was not Organizationally Separate and Distinct

The District Court correctly found that "the record evidence shows that there is no genuine issue of fact that the Aqueduct Buffet was not organizationally

separate and distinct." (JA 1394) The Aqueduct Buffet did not have its own

independent management that reported directly to a decision-maker at Resorts

World. (Id.)  Rather, the Food and Beverage department had a common

management structure that included all of the food outlets.  As seen in the

organizational charts (JA 491-94), all 30 of Resorts World's food outlets were

collectively managed by an Executive Chef and Assistant Director of the Food and

Beverage department.  Those two positions reported to the Director of Food and

Beverage – Randy Netter. (Id.)  Mr. Netter reported up to Resorts World Chief

Operating Officer, the first layer decision-maker, who then reported to the

President of Resorts World. (Id.)  Below the Executive Chef and the Assistant

Director of Food and Beverage were various positions that had authority over

either all or many of the food and beverage options. (Id.)

    Mr. Netter testified, and it is not disputed, that: both he and the Executive

Chef oversaw all thirty food and beverage outlets and determined what food was

served at all of them (JA 265) and the Executive Sous Chefs supervised and

performed managerial services, such as overseeing quality of product and

following policies and procedures, for every food outlet – "rotating all day long,

walking through different kitchens" (JA 267). Moreover, the single "Beverage

Manager" of the Food and Beverage department oversaw and ordered "all the

beverage that comes into the central warehouse for distribution to all outlets that

use beverage." (JA 269) The Stewards "reported to the one shift manager who oversaw **all the areas**" (JA 270) (emphasis added) Cooks in the Garde Manger reported to a manager outside of the Aqueduct Buffet and all of the central services had supervisors outside of the Aqueduct Buffet. (JA 484-85) Based on these facts, the District Court correctly found that the Aqueduct Buffet was not organizationally separate and distinct, rejecting Plaintiffs' unsupported argument to the contrary.

Based on the foregoing undisputed facts, the Aqueduct Buffet did not have its own managerial structure but was operated through management common to the Food and Beverage department.

### C. Plaintiffs do not Refute or Address that the Office of the Impartial Chairman Determined that the Aqueduct Buffet is not Separate and Distinct

As noted above, an important source of evidence which will assist in defining separate and distinct units, in addition to the above, is "industry understandings of what constitute distinct work functions." 54 FR 16042. On November 24, 2015, the Office of the Impartial Chairman, which was designated in the CBA as the authority to interpret the provisions therein and to hear and decide disputes between the Union members and Resorts World, issued a decision specifically holding that the Aqueduct Buffet was not a separate and distinct department as a matter of fact. (JA 383-400)

33

The Impartial Chairperson[17] presided over the Union's recent grievance that certain employees laid off on January 6, 2014 should have been entitled to "bump" a less senior employee in the same job classification pursuant to the relevant sections of the CBA. The term "bumping" refers to a practice whereby layoffs and recalls are governed by classification seniority, i.e., that the last employee hired in a job classification within "a department" will be the first laid off in such classification, and the employee with the greatest seniority in the job classification in the "department" will be the last laid off in such job classification." (JA 863) Thus, the Union was seeking back pay for members who were not given classification seniority in connection with the January 6, 2014 layoffs. The Union, acting on behalf of the Plaintiffs, asserted that each food outlet was **not** a separate department for purposes of classification seniority and argued at the grievance hearing that:

> the testimonial evidence of both the Union and Employer witnesses was that the Employer operated one food and beverage ("F&B") division which had multiple food and beverage outlets . . . the F&B division had one management structure under which the managers of each outlet reported to the F&B Director. All new F&B hires were . . . subject to the same [initial] policies and procedures regardless of which outlet they worked in. Employees working as Hosts/Hostesses and Servers received the same contractual rate of pay regardless of what outlet they worked in.

---

[17] The Impartial Chairperson is the same arbitrator who issued the Interest Arbitration Award.

(JA 391) The Union admitted that, "[s]ervers who worked in the Buffet also performed similar job duties as Servers who worked in the other F&B outlets . . . [T]he Servers also received the same rate of pay and benefits under the CBA . . . . Servers who worked in the Buffet also worked in RW Prime and Genting Palace on an as needed basis." (JA 391-92) The Union made such admissions on behalf of Plaintiffs and as their exclusive agent. Plaintiffs cannot now create a genuine issue of fact by simply denying them. Having considered the evidence proffered by the Union, much of which is the same contained herein, the Impartial Chairperson held:

> Thus, in assessing whether the laid off Buffet employees have, as the Union posits, rights to bump into similar classifications, **I must recognize that the evidence established that [Resorts World] operated a centralized food and beverage department, with a common management structure, under which there were a number of outlets. Many of the necessary elements of a food and beverage operation were common to all outlets, e.g., hiring, training, stewarding, and supplies and most importantly, jobs with vastly similar elements. . . .**
>
> **[I] find that the term "department" means a "food and beverage department." Thus, where jobs from one outlet to another are, in the overwhelming main, vastly similar or fungible so as to require little or no training, classification seniority must be given effect. In other words, for example, a more senior buffet host may bump a host in another outlet.**

(JA 399) (emphasis added)

Accordingly, the Impartial Chairperson held that "a more senior buffet host may bump a host in another outlet" because all food outlets operated under the same Food and Beverage Department. (JA 399)

The Impartial Chairperson clearly reflects the industry understanding, and he determined that the Aqueduct Buffet was not a separate and distinct "department" as a matter of fact based upon the generic job classifications, the uniformity of job duties transferable (and transferred) to all of the food and beverage outlets within the Food and Beverage department, the reliance of the Food and Beverage department on centralized services for all of its food outlets, and its utilization of centralized organization and management. (JA 383-400) These are the same factual considerations used to determine whether the Aqueduct Buffet is an "operating unit" under the WARN Act.[18] Accordingly, the Impartial Chairperson's factual finding the Aqueduct Buffet was a separate and distinct "department" should be given great deference and its use of the word "department" instead of "unit" is of no moment. See, Wallace v. Buttar, 378 F.3d 182, 189 (2d Cir. 2004); Westerbeke

---

[18] The Impartial Chairperson noted that "[t]here is no dispute that, perhaps as a vestige of its operations pre-CBA, the Employer historically referred to Bus Persons as Buffet Bus Persons," and that "[t]he Union maintains they should have been referred to as Food and Beverage Attendants." (JA 384) The same is true concerning the old title of "Buffet Cook." Regardless, the same job descriptions, salary, benefits and terms of employment and duties applied to all Cooks and Bussers/Attendants across Resorts World's entire facility.

Corp. v. Daihatsu Motor Co., 304 F.3d 200, 213 (2d Cir. N.Y. 2002) ("[T]he governing law must clearly apply to the facts of the case, *as those facts have been determined by the arbitrator*.") (emphasis in original); Alexander v. Gardner-Denver Co., 415 U.S. 36, 53 (1974) (it is the job of arbitrators to interpret a CBA in accordance with "industrial common law of the shop").[19]

The District Court properly considered the findings of the Impartial Chairperson to be "persuasive authority . . . particularly since the Impartial Chairperson relied on many of the same factual considerations in making his determination that are relevant to the analysis in this case." (JA 1397) "In any event," the District Court held, "the record evidence described in the above section is sufficient on its own to show that the Aqueduct Buffet was not an operating unit." (Id.)

### D. The District Court Properly Considered Resorts World's Expert Opinion that the Aqueduct Buffet was not an Operating Unit According to Accepted Business Practices

#### 1. Standard for Expert Evidence

The District Court properly considered the expert opinion of Bjorn Malmlund, CPA and partner at Ernst & Young LLP, that the Aqueduct Buffet was not an operating unit according to accepted business practices. Under Rule 702 of

---

[19] See also, Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) ("collateral estoppel can be predicated on arbitration proceedings") (citation omitted).

the Federal Rules of Evidence, an expert witness, unlike a lay witness, is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert v. Merrell Down Pharms., Inc., 509 U.S. 579, 592 (1993) (citation omitted). "Under Daubert, the district court functions as the gatekeeper for expert testimony, whether proffered at trial or in connection with a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks and citations omitted). "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form on an opinion or otherwise if it: (1) will assist the trier of fact to understand the evidence or determine a fact in issue; (2) is based on sufficient facts or data; (3) is the product of reliable principles and methods; and (4) is the product of a reliable application of the expert's principles and methods to the facts of the case." (JA 1398 quoting Fed. R. Evid. 702).

"To gauge the reliability of proffered testimony, 'the district court should consider the indicia of reliability identified in Rule 702,' which are not exhaustive." United States v. Raniere, No. 18-CR-204-1, 2019 WL 2212639 at *5 (E.D.N.Y. May 22, 2019) (quoting Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004)). However, as the District Court noted, "the court's inquiry into the reliability of expert testimony is 'flexible,' and the Daubert factors are not

dispositive.'" (JA 1399) (quoting <u>Raniere</u>, 2019 WL 2212639, at *5) "Indeed, the

Supreme Court clarified in a later case that the <u>Daubert</u> factors do not apply neatly

to all expert evidence, especially evidence that is not of the scientific nature found

in <u>Daubert</u>." (JA 1399 citing <u>Kumho Tire Co., Ltd. v. Carmichael,</u> 526 U.S. 137,

147-149 (1999). Likewise, "[t]he Second Circuit's standard for admissibility of

expert testimony is especially broad." (JA 1399 quoting <u>United States v. Herron,</u>

No. 10-CR-0615, 2014 WL 1871909 at *6 (E.D.N.Y. May 8, 2014) (internal

quotations and citations omitted). "An expert can provide reliable testimony by,

among other things, 'citing to reports, providing in-depth analysis of the facts,

providing peer review data, and explaining the basis for [their] conclusions.'" (JA

1399) (quoting <u>Fuente v. Scag Power Equip. – Div. of Metalcaft of Mayville, Inc</u>.,

No. 17-CV-825 (DRH)(AKT), 2019 WL 3804735 at *5 (E.D.N.Y. Aug. 13, 2019),

<u>appeal dismissed</u> (Dec. 27, 2019)).

Applying these principles, the District Court properly considered the opinion

and testimony of Mr. Malmlund.

### 2.     The Qualifications and Opinions of Resorts World's Expert

Bjorn Malmlund, a Partner with Ernst & Young, a Certified Public

Accountant and an accredited business evaluator with over 27 years of experience

analyzing business operations, reviewed virtually all the discovery in this matter,

including all of the record evidence referred to above, interviewed various Resorts

World employees, and physically toured the Resorts World facility. (JA 218-19)

Having conducted an extensive factual investigation, Mr. Malmlund issued an

expert report on May 8, 2015 (JA 214-45; 1312-41), concluding that the Aqueduct

Buffet is not an "operating unit" **according to well-accepted business practices.**

In his report and testimony, Mr. Malmlund set forth and applied the

following factors commonly used and generally accepted from a business

perspective to determine whether something is "organizationally and operationally

distinct," and which are strikingly similar to the DOL considerations: (1) provides

a distinct product or service; (2) has its own independent management which

reports directly to a chief operating decision maker; and (3) independently

performs all functions necessary to carry out its operations. (JA 222)

Applying the first factor, Mr. Malmlund concluded, based on the record

evidence, that the products offered by the Aqueduct Buffet are not distinct, since

many of the same items are available across other food outlets, including

vegetables, cold cuts, salads, sushi, dumplings, pizza, fruit cups and desserts.  (JA

223)  Mr. Malmlund also concluded that the "service" offered by the Aqueduct

Buffet was not distinct, since Resorts World offers two buffets – and

approximately 28 other food outlets where similar food and beverage items were

available.  (JA 9; 19; 223)  As to the second factor, Mr. Malmlund concluded,

based on the organizational charts and other relevant evidence identified above and

40

in his report, that the Aqueduct Buffet did not have its own independent management which reported directly to the chief operating decision maker. (JA 224-26)  Like the Impartial Chairperson, Mr. Malmlund found that Resorts World operated a centralized food and beverage department, with a common management structure. (Id.)  As to the third factor, based on the undisputed facts set forth in detail in Point I, above, Mr. Malmlund concluded that the Aqueduct Buffet did not independently perform all functions necessary to carry out its operation, but instead wholly relied on the many centralized services provided by Resorts World for its functioning.  (JA 226-29)

Mr. Malmlund also concluded, like the Impartial Chairperson, that the cross-sharing of employees and virtual identical job classifications across all food outlets detailed in Point I above, gave a strong indication that the Aqueduct Buffet was not operationally independent, was not organizationally independent and did not constitute a specific work function. (JA 229)

Mr. Malmlund also concluded that the Aqueduct Buffet was not financially independent and, therefore, was not an operating unit according to accepted business considerations. (JA 230-32) According to Mr. Malmlund, one of the factors considered according to accepted business practices is the preparation of "financial statements that comprise all of its operating expenses, including allocation of shared costs, so that the operating unit is clearly distinguishable for

41

financial reporting purposes form the rest of the parent entity." (JA 223)  It is undisputed that Resorts World did not track or report all financial information for every "cost center," particularly for amenities like the Aqueduct Buffet.  (JA 230; 486) It is also undisputed that Resorts World did not prepare financial statements that included all of the operating expenses, including allocations of shared costs, for the Aqueduct Buffet. (JA 230) Rather, Resorts World records and reports financial information for direct costs incurred in the Food and Beverage department on an overall summary basis, and shared costs are recorded where they are incurred, either at the overall Food and Beverage or casino level. (JA 230; 486) Examples of shared costs include those for centralized services (enumerated above), utilities, rent and other facility charges, salaries for administrative and executives, and insurance. (JA 230) Accordingly, no costs for rent, utilities or maintenance were allocated to the Aqueduct Buffet for the use of space; no costs for the Garde Manger were allocated to the Aqueduct Buffet; no costs for the Warehouse were allocated for the Aqueduct Buffet; no costs for Purchasing were allocated to the Buffet; and no costs for EVS, Human Resources, Marketing, Legal, Payroll, or any other administrative costs were allocated to the Aqueduct Buffet. (JA 487) As a result, the financial statements for the Aqueduct Buffet do not include all the costs necessary for their independent operation. (JA 230)

The other business factors Mr. Malmlund considered to determine a financially independent operating unit are the use of discrete assets and liabilities to generate revenues and the ability to derive revenues from independent sources. (JA 223) Neither of those factors exist here. The Aqueduct Buffet did not use its own discrete set of assets and liabilities to generate revenues: it did not derive revenue from a source independent from Resorts World's casino visitors; its customers were acquired as a result of Resorts World's marketing efforts to bring patrons to its casino operations and the complimentary or discounted services it provided to its casino guests; and nearly 42 percent of the Aqueduct Buffet's revenues for 2013 were complimentary and are recorded by Resorts World as a marketing expense as well as revenues for the Aqueduct Buffet. (JA 230-31)[20] Indeed in 2013, even before the Interest Arbitration Award was issued, Resorts World lost approximately $3.7 million by offering the Aqueduct Buffet. (JA 488) That loss would have been far greater had the Aqueduct Buffet had to pay for all the centralized and shared costs and were not allocated to it. The conclusion is inescapable that the Aqueduct Buffet was subsidized by Resorts World's overall operations and could not survive financially on its own. (JA 231)

---

[20] Of course, these complimentary revenues are nothing more than an allocation of Resorts World's own resources, financed by its gaming revenues.

Mr. Malmlund opined based on the foregoing that the Aqueduct Buffet was not an operating unit pursuant to accepted business considerations.[21]

### 3. The Court Properly Considered Mr. Malmlund's Opinions

Unable to refute his qualifications, the undisputed facts on which he relied and having failed to proffer a rebuttal expert report, Plaintiffs resort to arguing that Mr. Malmlund's testimony and opinions should be precluded pursuant to Fed. R. Evid. 702, asserting that this is the first time he has rendered such an opinion; his opinion is not based on reliable principles and methods; and that he inappropriately opined on the ultimate issue to be decided. Properly rejecting each of these arguments, the District Court held that based on his qualifications, certifications and over 27 years of experience, the fact that he was never engaged in a matter involving the WARN Act was not dispositive:

> Where an expert possesses qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent. . . . Having considered Mr. Malmlund's qualifications, the Court finds that it is not necessary that he have prior experience in cases involving the WARN Act in order to opine on the definition of operating unit.

(JA 1400) (quoting, Hilaire v. DeWalt Indus. Tool Co., 54 F.Supp.3d 223, 236 (E.D.N.Y. 2014)) (internal quotations and citation omitted).

---

[21] Plaintiffs have not submitted any rebuttal expert report and, thus, the opinions and conclusions set forth in the Malmlund Report remain unchallenged.

As for Mr. Malmlund's principles and methods, the District Court noted that after reciting the DOL's definition of "operating unit" for purposes of the WARN Act, he listed other definitions of "operating unit" that he testified are commonly used and generally accepted from an accounting operational perspective. "Thereafter, based on his knowledge and experience, [Mr. Malmlund] listed a number of factors that are typically considered in the determination of an operationally or financially independent operating unit according to business evaluation and accounting practices." (JA 1400-01 citing JA 222-23) Thus, the District Court found that "[i]n short, Mr. Malmlund relied on his knowledge and over 27 years of experience in accounting in his analysis" and that based on his report and its exhibits "he heavily relied on his review of the record evidence, interviews with various Resorts World employees, and a tour of the facility in coming to his conclusions." (JA 1401) Accordingly, the District Court correctly found "that Mr. Malmlund's report is not, as plaintiffs assert, too unreliable to be considered." (Id.)

Finally, Plaintiffs' contention that Mr. Malmlund's report and opinions should be precluded because they invade the province of the court is disingenuous. Mr. Malmlund's report and opinions addressed whether the Aqueduct Buffet was an independent operating unit based on **accepted business practices** in order to aid the trier of fact. Therefore, his report and opinions do not improperly invade

the province of the court to determine applicable law. Also specious is Plaintiffs'

brazen misstatement that Mr. Malmlund's report and conclusion "is the sole

conclusion which the [District] Court draws to justify dismissal of the Amended

Complaint." (Pl. Br. at 27). It is clear from the 21-page Decision and Order that

the District Court considered all of the evidence in its entirely and rendered its

Decision and Order accordingly and not **solely** based on the Malmlund Report or

opinions. As the District Court concluded: "Based on its review of the pleadings

and the record evidence described above, the Court concludes that Resorts World

has sufficiently proven that the Aqueduct Buffet was not an operating unit under

the federal WARN Act and N.Y. WARN Act" and that "Plaintiffs have failed to

come forward with specific facts showing that there is a genuine issue for trial."

(JA 1402)

## II. THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFFS' ARGUMENT THAT THE AQUEDUCT BUFFET WAS A SINGLE SITE OF EMPLOYMENT

The WARN Act defines a "plant closing" as the "permanent or temporary

shutdown of a single site of employment or one or more facilities or operating

units within a single site of employment." 29 U.S.C. § 2101(a)(2); NYLL § 860-

a(6). In a specious attempt to avoid the weakness in their "operating unit"

argument, Plaintiffs alternatively and belatedly argue that the Aqueduct Buffet was

a "single site of employment." (Pl. Br. at p. 24) Plaintiffs' argument is absurd and

was worthy of being summarily rejected in a footnote by the District Court. (JA 1389) Clearly, Resorts World is the single site of employment, as there is only one company, one employer, one building which housed all employees across all departments, including the various food outlets, casino games, administrative offices, engineering, human resources, finance, maintenance and, notably, one CBA. (JA 223-32; 480-88) There is no dispute that Resorts World did not close down its facility. The "single site" reference in the WARN Act has been used to aggregate and interpret different physical locations as a "single site" if they are in reasonable geographic proximity. See, e.g., 20 C.F.R. § 639.3(i)(3); 12 NYCRR 921-1.1(p)(v). Plaintiffs curiously argue the opposite – that the Aqueduct Buffet should be segregated from and not be combined with Resorts World. Plaintiffs' tortured interpretation of the WARN Act, and its recycled assertions that are expressly contradicted by the record, as set forth above (e.g., that the Aqueduct Buffet had "its own workforce" and "its own management") have no credence in law or fact and they should, once again, be categorically rejected.[22]

---

[22] Moreover, having failed to raise the "single site of employment" in its Amended Complaint, asserting solely that the Aqueduct Buffet was an "operating unit" under the WARN Act, Plaintiffs are barred from now asserting that claim.

## CONCLUSION

For the foregoing reasons, Genting New York LLC d/b/a Resorts World Casino New York City respectfully requests that the District Court's Decision and Order of March 12, 2021 granting Resorts World's motion for summary judgment dismissing Plaintiffs' Amended Complaint in its entirety and denying Plaintiffs' cross-motion for summary judgment should be affirmed.

Dated: September 15, 2021

> **KANE KESSLER, P.C.**
> *Attorneys for Defendant/Appellee*
> *Genting New York LLC d/b/a*
> *Resorts World Casino New York City*
>
> By: */s/ Dana M. Susman*
> Dana M. Susman
> Jonathan M. Sabin
> 600 Third Avenue
> New York, New York 10016
> Tel: (212) 541-6222
> Fax (212) 245-3009
> dsusman@kanekessler.com
> jsabin@kanekessler.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 11,247 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Time New Roman.

Dated:    September 15, 2021
           New York, New York


                                  */s/ Dana M. Susman*
                                    Dana M. Susman