# No. 21-833

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

GERALD ROBERTS, STEPHEN JOHNSON, CHRISTOPHER MCLEOD, DAVID SHAW, ANITA JOHNSON, CHRISTOPHER HUMPHRIES, JEFFREY WILKINS, LATANYA MARTIN-RICE, LAURA SANCHEZ, LUCY MUNOZ, NATALIO HERRERA, RADIKA KANHAI, ROGER SIERRA, YOO SUNG KIM, CHRISTINA LAMBRU, IRENE TSOROROS, MARIA DIAZ, CYNTHIA DURAN, JASPER JONES, ALLEN CHERFILS, LISA LUNDSREN, TERESA AREVALO, SYED A. HAQUE, AHMED TALHA, OLIE AHMED, JAMAL AHMED, SORWAR HUSSAIN, LUZ OSPINA, JOHNNY MURILLO, THOMAS DORGAN, SENECA SCOTT, ERIC LEE, WILLIAM BOONE, MARLENNI MINAYA, ISABEL PENA, CELESTE BROWN-POLITE, DWIGHT CURRY, RAWLO BENFIELD, JOSEPH BROWN, SANDRA MILENAMARTINEZ, MARINO CANO, ABIGAIL APPIAHOTCHERE, DALIA TOPPIN, ANA MOREIRA, BETSABE TORRES, LORNA BENT, OSMOND WALKER, CONRAD HALL, VISHWANI SUKHRAM, ANNE GRONATA, BRUCE SMITH, NESTOR AMAYA, GUIDO ANTONIO RODRIGUEZ, WILLIE BALLENTINE, PETER VONTAS, FELIX GONZALEZ, MICHELLE LATIMER, VARISE WALLER, SOOKIA FREEMAN, CAMARCA FLOWERS, ANTONIO SALCEDO, JOEVEN CORTEZ, and JUDITH ALLEN *on behalf of themselves and all others similarly situated*,

*Plaintiffs-Appellants*,

-against-

GENTING NEW YORK LLC, D/B/A RESORTS WORLD CASINO NEW YORK CITY,

*Defendants-Appellees*,

*On Appeal from a Judgment of the
United States District Court for the Eastern District of New York*

**PLAINTIFFS-APPELLANTS' BRIEF IN REPLY**

Jesse C. Rose, of Counsel to
Phillips & Associates, PLLC
45 Broadway, Suite 430
New York, New York 10006
212-248-7431

# TABLE OF CONTENTS

**Table of Contents**...................................................................................................... i

**Table of Authorities**................................................................................................. ii

   **I.  PRELIMINARY STATEMENT**..........................................................................1

   **II. RESPONSE TO DEFENDANT'S STATEMENT OF FACTS**...................2

        A.  **The CBA**....................................................................................2

        B.  **Operation of Resorts World** ....................................................3

        C.  **Organization of Resorts World** ..............................................6

        D.  **The Interest Arbitration Award** ............................................6

        E.  **"Cooperation with" Plaintiff's Union**...................................7

   **III. RESPONSE TO LEGAL ARGUMENT**.................................................8

        A.  **Plaintiffs pled that the Aqueduct Buffet was a single site of employment**................................................................8

        B.  **The Aqueduct Buffet was an Operating Unit** .................................9

            1.  The CBA supports Plaintiffs' claims............................................9

            2.  The Aqueduct Buffet was Operationally Separate and Distinct ...................................................................................10

            3.  The Aqueduct Buffet was Organizationally Separate and Distinct ...................................................................................12

        C.  **The Impartial Chairman decision does not support Defendant's argument** ...........................................13

        D.  **The expert report of Bjorn Malmlund should be held to be inadmissible under fre 702**................................13

   **IV. CONCLUSION**................................................................................15

# TABLE OF AUTHORITIES

**Cases**
United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ............................... 14

**Statutes**
29 U.S.C. § 2101(a)(2) ................................................................................................ 8
NYLL § 860-a(6) ........................................................................................................ 8

**Other Authorities**
Note, Expert Legal Testimony, 97 Harv. L. Rev. 797 (1984) ................................... 14

# I. PRELIMINARY STATEMENT

Plaintiffs-Appellants on behalf of themselves and all other similarly situated individuals ("Plaintiffs") file this brief in Reply to Defendant-Appellant Genting New York LLC dba Resorts World Casino New York City's ("Genting" or "Defendant") Opposition to Plaintiffs' appeal from a final judgment entered by the District Court. Judgment, A1382; SA1.[1][2] Defendant's opposition fails to submit authority supporting their proposed standards for WARN Act and NY WARN Act (the "WARN Acts") application, which essentially would lead to these laws only applying to businesses which intentionally separate Operating Units and document their separation in a collective bargaining agreement. Defendant's opposition draws numerous conclusions against the evidence in the record and further attempts to rewrite the WARN Acts to justify their defense. The opposition to this appeal is devoid of authority or evidence from which any reasonable jury could conclude that Plaintiffs were not terminated without the appropriate notice, in violation of the WARN Acts. For all of the reasons set forth herein as well as within the Plaintiffs' opening brief, the Appendix and the Special Appendix, this Court should reverse the lower Court's decision and grant Plaintiffs' motion for summary judgment.

---

[1] The Appendix will be cited as "A__."
[2] The Special Appendix will be cited as "SA__."

1

## II. RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

Defendant's statement of facts fails to see the forest for the trees. Rather than painting a picture of the business as a whole, they focus on the factors they have unilaterally determined to be relevant: the CBA's lack of definitions for what constitutes a department, company-wide support services, common executive level management, and an arbitration which focused on seniority rights for those terminated. This focus on unrelated details of the casino's operations disregards that the Plaintiffs were all terminated due to the closing of what was essentially a stand-alone restaurant, a circumstance well within the definition of both an Operating Unit and a Single-Site of Employment under the WARN Acts and requiring advanced notice.

### A. The CBA

Defendant concludes that the relevant facts relating to the CBA are that the Aqueduct Buffet is not identified as a separate department, that job classifications are common for non-managerial employees between different restaurants, and that employees could transfer between restaurants and food outlets. Defendant's Brief ("DB"), pp. 3-4. The CBA does not define any "departments," using the word without particular reference only in sections relating to "Layoffs and Recalls", in connection to "the Human Resources Department," and in a list of events which could trigger entitlement to severance. A863, 882, 884. Further, in direct

2

contradiction to the conclusion that Plaintiffs were all "former Cooks, Food Servers, Food Runners, Bussers, Hosts, Cashiers, Stewards and Warehousemen", Plaintiffs include two additional categories left out: Buffet Cook and Buffet Bus Person. List of employees laid off, A850-2. Defendant ignores that most of these employees worked their regular shifts only within the Aqueduct Buffet and further that all of them were terminated due to the closure. Requests for Admission No. 1, A60-1; Netter Depo pp. 72:2-18, 121:6-20; A86, 97. Thus, while there is no distinction of the Aqueduct Buffet being a "Department" within the CBA *per se*, there is also no definition of the word or any discussion at all about what delineations within the Food and Beverage operation would exist. Further, where there is a delineation of sections within the covered employees within the CBA, "restaurants" is included, of which the Aqueduct Buffet was certainly one. A859 ("in any a la carte restaurant as well as to all buffet…"); A884 (severance is due if "resulting from the closing of the Employer or a restaurant, department or a concession therein…"). The lack of explicit definition of an Operating Units or Single-Sites of Employment within the casino does not support the conclusion offered by Defendant that there were none.

   B. **Operation of Resorts World**

Defendant attempts in describing the operation of the casino to falsely paint a picture wherein all Plaintiffs would move fluidly through different restaurants and assignments. This is simply not the case. Defendant concludes that "**all Stewards** on

3

a particular shift were assigned to different areas of Resorts World on a daily basis." DB5 [emphasis in original]. However, there is no evidence to support that conclusion. The cited evidence shows that Stewards were assigned to work in a single location during day shifts and then at night they cleaned everywhere without any information about whether they had a regular assignment. Netter Depo p. 106:10-16, A273 ("The way I understood it was that they were bidded by shift and they were assigned daily to where they went."). Other than Stewards, employees in the *garde manje* and the warehouse employee, the Casino "laid off all F&B employees who worked in the Buffet, including Servers, Buffet Buspersons, and Hosts/Hostesses. It implemented these layoffs without taking into consideration that some of the employees in these job classifications had more seniority than other Casino employees employed in the same classifications and working in other food and beverage outlets within the Casino, i.e. RW Prime and Genting Palace." Impartial Chairperson Decision dated Nov. 24, 2015 p. 9 of 18, A391. The decision, by the Impartial Chairperson relied upon extensively by Defendant, clearly states that all Plaintiffs were fired because they worked in the Aqueduct Buffet.[3] Further, their own Director of Food and Beverage unequivocally testified that the Aqueduct

---

[3] Defendant baselessly concludes that "Plaintiffs admit that they were often times assigned to work at different food and beverage outlets", solely citing the testimony from one Plaintiff that he and others had applied to general positions originally and at one point learned how to work in other kitchens. DB5-6.

Buffet employees worked solely within the Aqueduct Buffet except for special circumstances, the frequency of which was never specifically stated. Netter Depo p. 121:6-20, A97 ("Q. The schedules the people were given once every six months that were based on seniority, did those schedules have anyone who was working within the buffet work in a different location on a weekly or biweekly basis or monthly basis? A No. Q. So it was only if there was a necessity in another area would someone come over and say, hey, we need a cashier or server, whatever they were missing, right? A. Yeah, based on a special event, yes, exactly. Weather, special event, callout, PTO.").

Defendant also argues that "[t]he Aqueduct Buffet was entirely dependent upon Resorts World's centralized services and could not operate in their absence." DB7. The "services" cited include the few food items prepared in the *garde manje*, recipes, purchasing, warehousing, stewarding, marketing, human resources, legal, payroll and accounts payable. DB7-10. However, this type of outside support for a restaurant could occur if Defendant operated a franchise or multiple stand-alone restaurants. These factors are not indicative of the Aqueduct Buffet not being an Operating Unit or Single-Site of Employment as much as it is proof that Defendant is a large, complex company, which should be expected to comply with the WARN Acts.

5

### C. Organization of Resorts World

It is difficult to understand Defendant's argument as to organization as it relates to the WARN Acts. It seems that Defendant is arguing that because there is executive level management over all of the restaurants and food outlets, that this is a factor in their favor. DB10-11. Defendant ignores that there were managers that ran the day to day operations of the Aqueduct Buffet internally, only requiring coordination between other restaurants and high level approvals. Food and Beverage – Buffet hierarchy, A132; Food and Beverage – Executive Chef hierarchy, A133; Netter Depo pp. 72:2-74:22, A86-8. Any franchise or restaurant with multiple locations would have the same type of executive management and this is not a factor in determining whether the Aqueduct Buffet was an Operating Unit or Single-Site of Employment.

### D. The Interest Arbitration Award

Defendant improperly raises the issue of the Interest Arbitration Award which granted Plaintiffs and other low wage earners raises due to their collective bargaining power as a factor in the case. It is not a factor. Defendant cites the "catastrophic" effects of paying their employees what the arbitrator determined to be a fair wage and then go on to claim that this effected their "economic stability." DB11-12. What Defendant fails to provide is any financial statement to demonstrate this effect or argument which would affect any element of this case, as this issue would have to

6

be raised as an affirmative defense, and it is not. Defendant's Answer and Affirmative Defenses ¶¶166-84, A50-3. Defendant failed to plead this defense despite the WARN Acts explicitly including defenses relating to faltering companies and unforeseeable business circumstances. See 29 U.S.C. § 2102(b)(1); 20 C.F.R. § 639.9(b). The casino's effort to induce sympathy to their financial position due to an increase in wages for kitchen workers, servers, cleaners, and other manual laborers earning a low hourly wage, all of whom were terminated with no notice, should be immediately disregarded as ludicrously disingenuous.

Defendant later argues that the interest arbitrator's decision that the "term 'department' means a 'food and beverage department'" should be dispositive on the issue of whether the Aqueduct Buffet was an Operating Unit or Single-Site of Employment. DB17. This argument ignores that the same document they site repeatedly discusses that the various restaurants are each an "outlet", a delineation much more comparable to Operating Unit and Single-Site of Employment. See Interest Arbitration Award A399. Defendant's efforts to skirt the language of the law and accompanying regulations is transparently evasive.

### E. "Cooperation with" Plaintiff's Union

Defendant claims that the Plaintiffs' Union approved these layoffs and effectively waived their right to notice under the WARN Acts. DB13-14. This directly contradicts the reasons that an arbitration occurred later, as the Union did

7

not agree with how the decisions were made to lay off the Plaintiffs. A390-1. Further, Defendant argues this point without any citation to a waiver, a notice to the Union, or any of the documentation that would presumably accompany such a legal decision. These "facts" asserted without evidence should likewise be disregarded as meaningless in the consideration of Plaintiffs' claims.

### III.     RESPONSE TO LEGAL ARGUMENT

The Parties are in agreement as to the standards of review and proof.

**A. Plaintiffs pled that the Aqueduct Buffet was a single site of employment**

Defendant argues that "Plaintiff[s] did not allege that Resorts World shut down a single site of employment or facility." DB21. While not phrased identically to how they would apparently prefer, the Amended Complaint repeatedly alleges that the shutdown constituted the closing of a "separate site of employment, facility and/or operating unit existed which was called the 'Aqueduct Buffet'," "the Aqueduct Buffet constituted a site of employment, facility or operating unit within the definition provided by 29 U.S.C. § 2101(a)(2) and NYLL § 860-a(6)," "closing a site of employment, or one or more facilities," "closing a site of employment, or one or more facilities," Amended Complaint ¶¶ 70, 80(e), 161, 164. Further, the District Court dismissed Plaintiffs' claim seemingly on the merits, not because it was not properly pled or otherwise. SA8 n.3. Plaintiffs sufficiently pled that the Aqueduct

8

Buffet constituted a single-site of employment to put Defendant on notice that they were pursuing this theory and Defendant's conclusion to the contrary is meritless.

### B. The Aqueduct Buffet was an Operating Unit

Defendant's arguments mirror their factual sections, arguing that (1) the CBA does not support Plaintiffs' claims, (2) that "The Aqueduct Buffet was not Operationally Separate and Distinct", and (3) that "The Aqueduct Buffet was not Organizationally Separate and Distinct." Defendant's arguments on each of these points avoid plain meaning of the words in the laws themselves and further are completely devoid of significant legal authority to support their conclusions.

1. <u>The CBA supports Plaintiffs' claims</u>

Defendant claims that "[t]he CBA … does not identify the Aqueduct Buffet … as a separate department, division or unit of Resorts World." DB22. Of course, they must ignore that the different restaurants are referred to as "restaurants" which logically could be considered a division or unit. A859, 884. Indeed, if a "restaurant, department or a concession therein" is closed, all of the employees terminated as a result are entitled to severance. A884. As Defendant admits, Plaintiffs received that severance. The CBA supports Plaintiffs' claims, and the District Court's decision should be reversed.

Defendant then argues that because the impartial arbitrator interpreted the term "department" to not be the restaurants or concessions within the food and

9

beverage department that this should be interpreted against Plaintiffs. DB23. That decision, related to seniority rights in event of a large layoff, does not discuss any distinctions between restaurants and concessions. A383-400. Instead, the Impartial Chairperson clearly labeled the Aqueduct Buffet and other restaurants as "outlets," which certainly could be an operating unit. Id. ("The outlets include the Food Court, the Aqueduct Buffet, Prime, Genting Palace, Banquet, NYRA Buffet and Stewarding." A390). The CBA and the decision of the Impartial Arbitrator both support the conclusion that the Aqueduct Buffet was an Operating Units.

  2. <u>The Aqueduct Buffet was Operationally Separate and Distinct</u>

Defendant argues that the fact that they have two buffets in the casino means that either could not be a "distinct product." DB24. Defendant only cites the affidavit of their CFO, Ryan Eller, for this conclusion which essentially states the same thing without detail. Id. (citing A475-6). They are distinct, however, as the NYRA buffet, named the "Equestrius", existed before the casino, was in a different building which is connected to the casino, remained open after the Aqueduct Buffet closed, and had separate employees. Netter Depo pp. 8:9-9:22, A1157-8; A773 (email detailing that "the 5 culinary employees remaining in the buffet are employees that are currently working in the NYRA food outlets."). In documents discussing the reduction in force, NYRA Buffet employees are listed completely separately from the Aqueduct Buffet employees. See A709. The existence of two buffets does not support the

10

conclusion that the Aqueduct Buffet was not an Operating Unit any more than if there was another buffet across the street, as they are not the same restaurant or outlet and were operationally distinct and separate.

Defendant also concludes, citing the District Court's decision, that workers rotated throughout the food outlets. DB24-25. The only employees who actually worked in different areas were Stewards, who were terminated based on seniority. The remaining employees within the Aqueduct Buffet were scheduled by the Aqueduct Buffet's management because they worked consistently and, except for special circumstances, only within the Aqueduct Buffet. Netter Depo p. 121:6-20, A97 ("Q. The schedules the people were given once every six months that were based on seniority, did those schedules have anyone who was working within the buffet work in a different location on a weekly or biweekly basis or monthly basis? A No. Q. So it was only if there was a necessity in another area would someone come over and say, hey, we need a cashier or server, whatever they were missing, right? A. Yeah, based on a special event, yes, exactly. Weather, special event, callout, PTO."). This conclusively shows that the Aqueduct Buffet was organizationally distinct as it had its own workforce.

Defendant also falsely claims that "Plaintiffs … admit … that they were often times assigned to work at different food and beverage outlets." DB26 (citing testimony that people applied for various jobs and may have been trained in multiple

kitchens). They cherry pick their cited material, as the same Plaintiff clearly testified that after being hired they assigned him to work in one location. Lee Depo pp. 12:12-13:5, A321-2. There is nothing within the Appendix that supports Defendants' conclusion as the vast majority of the employees working in the Aqueduct Buffet only worked in that restaurant other than special circumstances. Netter Depo p. 121:6-20, A97.

The remainder of the Defendant's arguments in their organizational section refer to centralized services. DB27-31. However, there is not a single citation to a regulation, statute, court decision, or other authority other than the District Court's decision to support this argument. This Court should not adopt the Defendant's novel interpretation of the WARN Acts and not require "independence" to be a required aspect of an Operating Unit.

3. <u>The Aqueduct Buffet was Organizationally Separate and Distinct</u>

Defendant argues that the "Aqueduct Buffet did not have its own managerial structure" based on the fact that there were managers over the front and back of house managers in the restaurant. DB31-33. This conclusion only holds water if the law required that Operating Units be independent, which it does not. Rather, having its own regular management who made day to day decisions fully supports the notion that this was an organizationally separate and distinct entity from other restaurants

within the casino. See Food and Beverage – Buffet hierarchy, A132; Food and Beverage – Executive Chef hierarchy, A133; Netter Depo pp. 72:2-74:22, A86-8.

### C. The Impartial Chairman decision does not support Defendant's argument

Defendant claims that "the Office of the Impartial Chairman … issued a decision specifically holding that the Aqueduct Buffet was not a separate and distinct department as a matter of fact." DB33. However, that is not what was even asked and certainly not concluded anywhere in their cited decision. See A383-400. Further, the entirety of Defendant's argument relies on Plaintiffs claiming that the division or department label would be equivalent to an Operating Unit. That is not what Plaintiffs are claiming, rather, the term "restaurant" or "outlet" would be equivalent to Operating Unit, and the Impartial Chairman did conclude that the Aqueduct Buffet fit the definition of outlet and the CBA defines it as a restaurant. This Court should find as a matter of law that the Aqueduct Buffet was an Operating Unit under the WARN Acts.

### D. The expert report of Bjorn Malmlund should be held to be inadmissible under FRE 702

Defendant argues that their expert report was based on accepted business practices. DB40. Defendant summarizes those practices as "list[ing] other definitions" of operating unit and then determining whether the Aqueduct Buffet was "an operationally or financially independent operating unit," essentially discarding

the definitions in the law and adding adjectives not used by any legislature, Court, or either the New York State or Federal Departments of Labor. DB45. Mr. Malmlund's definition requires that an Operating Unit "ha[ve] its own independent management which reports directly to a chief operating decision maker; and … independently perform[] all functions necessary to carry out its operations." DB40 (citing A222). He also added that they must have "discrete assets and liabilities to generate revenues and the ability to derive revenues from independent sources." DB43 (citing A223). Mr. Malmlund essentially rewrote the WARN Acts to fit the Defendant's argument and the District Court accepted those changes in making its decision. Even Defendant's brief attempts to rewrite the law, interchanging "operating unit" with "independent operating unit." DB43, 45. "As a general rule an expert's testimony on issues of law is inadmissable." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) (citing Note, Expert Legal Testimony, 97 Harv. L. Rev. 797 (1984)). Here, Defendant's expert does not just invade an issue of law which is the province of the judge, it also seeks to replace the legislature as well. This report cannot be considered admissible and the District Court's decision should be reversed.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court (1) reverse the District Court's decision granting Defendant summary judgment, (2) reverse the District Court's decision denying Plaintiffs' summary judgment, (3) reverse the District Court's decision that the expert report of Bjorn Malmlund was admissible, (4) remand the matter for further proceedings, including class certification and determination of damages, and (5) award the attorneys' fees and costs associated with this appeal.

Dated: Astoria, New York
October 6, 2021

**PHILLIPS & ASSOCIATES PLLC**

/s/Jesse C. Rose
Jesse C. Rose, Of Counsel
*Attorney for*
*Plaintiffs-Appellants*
45 Broadway, Suite 430
New York, New York 10006
(212) 248-7431

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit of Fed. R. App. P. [*32(a)(7)(B)(i)*] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) [and [*insert applicable Rule citation, if any*]]:

    ☑ this document contains [*3316*] words, **or**

    ☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    ☑ this document has been prepared in a proportionally spaced typeface using [*Microsoft Word*] in [*Times New Roman, Font 14*], **or**

    ☐ this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

(s) /s/ Jesse C. Rose

Attorney for Plaintiffs/Appellants

Dated: October 6, 2021